## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MOVORA LLC (f/k/a OSSIUM NEWCO LLC); OSSIUM BIDCO, LLC; and VETERINARY ORTHOPEDIC IMPLANTS, LLC (f/k/a VETERINARY ORTHOPEDICS IMPLANTS, INC.), | ) ) ) ) ) ) | |
| Plaintiffs/Counterclaim Defendants, | ) ) | |
| v. | ) ) ) | C.A. No. N23C-05-034 MAA CCLD |
| CLAUDE GENDREAU; THE CLAUDE GENDREAU INVESTMENT TRUST U/A/D MARCH 16, 2013; PATRICK GENDREAU; BRIAN BEALE; and TIMOTHY VAN HORSSEN, | ) ) ) ) ) ) ) | |
| Defendants/Counterclaim Plaintiffs. | ) ) | |

Submitted: June 17, 2025
Decided: August 29, 2025

## POST-TRIAL OPINION

Megan W. Cascio, Esquire, of MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE, and Kevin M. Downey, Esquire (Argued), R. Kennon Poteat III, Esquire (Argued), Eden Schiffmann, Esquire (Argued), and Ilana B. Frier, Esquire, of WILLIAMS & CONNOLLY LLP, Washington, DC, *Attorneys for Plaintiffs/Counterclaim Defendants*.

David E. Ross, Esquire and S. Reiko Rogozen, Esquire, of ROSS ARONSTAM & MORITZ LLP, Wilmington, DE, and Andrew W. Vail, Esquire (Argued), Benjamin J. Bradford, Esquire, and Yusuf Esat, Esquire, of JENNER & BLOCK LLP, Chicago, IL, *Attorneys for Defendants/Counterclaim Plaintiffs Dr. Claude Gendreau and The Claude Gendreau Investment Trust U/A/D March 16, 2013*.

**Adams, J.**

## I. INTRODUCTION

This dispute arises out of non-party Fidelio Capital II AB's ("Fidelio") acquisition of Veterinary Orthopedic Implants, LLC (f/k/a Veterinary Orthopedic Implants, Inc.) ("VOI") (the "Transaction"). The parties effectuated the Transaction pursuant to an Amended and Restated Membership Interest Purchase and Exchange Agreement (the "MIPA"). The MIPA's indemnification provisions are central to the parties' dispute.

Before, during, and after the Transaction, VOI was defending a patent infringement suit brought by non-parties DePuy Synthes Products, Inc. and DePuy Synthes Sales, Inc. (collectively, "DePuy"). DePuy filed suit in the United States District Court for the Middle District of Florida under the caption: *DePuy Synthes Products, Inc. et al. v. Veterinary Orthopedic Implants, Inc.*, 3:18-cv-01342-HES-PDB (the "Patent Litigation"). Post-Transaction, DePuy added Fidelio to the expanding Patent Litigation. The Patent Litigation jury found VOI and Fidelio liable for willful infringement and awarded DePuy $60 million. After that verdict, DePuy, Fidelio, and VOI agreed to a $70 million settlement (the "Settlement").

Through this action, Plaintiffs seek indemnification from Defendants for the Settlement pursuant to the MIPA's indemnification provision. Plaintiffs argue the entire Settlement, as well as their associated costs and fees, are indemnifiable. The remaining Defendant in this case contends Plaintiffs breached the MIPA, obviating

any indemnification obligation. Even if certain portions of the Settlement are covered, the remaining Defendant maintains various non-recoverable components are not indemnifiable. For the reasons discussed herein, the Court concludes Defendants have not proven Plaintiffs materially breached the MIPA. The Court finds the entire Settlement is indemnifiable, except for the forward-looking license covering certain VOI plates. Judgment is therefore entered in favor of Plaintiffs, who are entitled to $40,172,084.49 in damages.

## II.  FACTS

### A. The Parties and Relevant Non-Parties

Plaintiffs/Counterclaim Defendants Movora LLC (f/k/a Ossium NewCo, LLC) ("Movora"), Ossium BidCo, LLC ("Ossium BidCo"), and VOI (collectively with Movora and Ossium BidCo, "Plaintiffs"), are each a Delaware limited liability company.[1] Under the MIPA, Movora is the "Buyer," Ossium BidCo the "Parent," and VOI the "Company."[2] Non-party Fidelio, is a Swedish corporation.[3]

Defendants/Counterclaim Plaintiffs Claude Gendreau ("Claude")[4] and The Claude Gendreau Investment Trust u/a/d March 16, 2013 (the "Trust")[5], are

---

[1] Joint Pretrial Stipulation and Proposed Order (hereafter "Pretrial Stip.") at 11 (D.I. 263).
[2] *Id.*
[3] *Id.* at 12.
[4] Because Claude Gendreau and Patrick Gendreau share a surname, this opinion refers to them by their first names for clarity. The Court intends no disrespect or familiarity.
[5] Because Claude and the Trust have identical legal interests, the Court often refers to them collectively as Claude.

domiciled in Indiana.[6] Claude founded VOI in 1992.[7] Before the Transaction, Claude owned VOI along with former Defendants Patrick Gendreau ("Patrick"), Brian Beale ("Beale"), and Timothy Van Horssen ("Van Horssen").[8] During this period, Patrick served as VOI's CEO and ran the day-to-day operations.[9] Post-Transaction, Patrick continued as VOI's CEO until he resigned in December 2022.[10]

## B. DePuy Files the Patent Litigation and Defendants Shop VOI

DePuy initiated the Patent Litigation in November 2018 – alleging VOI's "Swiss" plates infringe DePuy's U.S. Patent No. 8,523,921 (the "'921 Patent").[11] VOI hired Fox Rothschild as its Patent Litigation counsel.[12] In July 2019, DePuy amended its complaint to also accuse VOI's "Elite" and "CBLO" plates of infringing the '921 Patent.[13]

---

[6] Pretrial Stip. at 12. Because Claude and the Trust have identical interests in this dispute, the Court often refers to them collectively as Claude.
[7] *Id.*
[8] *Id.* Each Defendant is a "Seller" under the MIPA. *Id.* at 12-13. Patrick, Beale, and Van Horrsen (collectively "Settling Defendants"), settled with Plaintiffs before trial and were dismissed via stipulation. *See* D.I. 130 (dismissing Beale); D.I. 167 (dismissing Van Horssen); D.I. 197 (dismissing Patrick).
[9] DX130; Trial Transcript February 11, 2025 (hereafter "2/11/25 Tr.") 223:20-224:13, 235:11-237:19.
[10] PX122; Trial Transcript February 10, 2025 (hereafter ("2/10/25 Tr.") 122:15-17; Trial Transcript February 13, 2025 (hereafter "2/13/25 Tr.") 61:7-65:8.
[11] JX08.
[12] *See, e.g.*, PX14 (communication between Patrick and Fox Rothschild regarding VOI's Patent Litigation defense).
[13] DX44.

At the same time, VOI began developing a new plate – the NXT plate – to replace Swiss plates.[14] VOI launched NXT plates in October 2019 and discontinued Swiss plates.[15] DePuy requested discovery on NXT plates almost immediately.[16] Based on this discovery, Fox Rothschild informed Defendants that DePuy "intent[ed] [] to add [] NXT plates to the [Patent Litigation]."[17]

Faced with the expanding Patent Litigation,[18] Claude directed Patrick to reach out to parties interested in buying VOI.[19] Patrick discussed a possible sale with private equity company DWHP,[20] but negotiations stalled due to the Patent Litigation.[21] Patrick suggested an asset purchase to insulate any Patent Litigation liability, but DWHP declined.[22] It was under these circumstances that Fidelio first entered the picture.[23]

---

[14] D.I.218, Ex. 3 (hereafter "Patrick Dep. Tr.") 47:3-9, 106:1-22; PX179; 2/11/25 Tr. 183:23-184:2.
[15] DX566.
[16] PX67; *see* PX68.
[17] PX65; *see* 2/11/25 Tr. 184:3-8; PX084 (email from Fox Rothchild to Patrick stating, "we fully expect [DePuy] to allege your new plates [NXT] also infringe although they have not done so yet. They have certainly suggested they will be doing so.").
[18] PX14 (Fox Rothchild informing Patrick early in the Patent Litigation that DePuy would likely expand the list of accused plates); PX017 (DePuy's amended complaint expanding the patent litigation); PX10 (email from Patrick discussing the potential for DePuy to expand the Patent Litigation); PX19 (email discussing DePuy's efforts to receive a continuation patent, which could expand the Patent Litigation).
[19] 2/11/25 Tr. 83:12-20.
[20] Patrick Dep. Tr. 27:24-28:2.
[21] *Id.* 60:16-61:1; 2/11/25 Tr. 95:22-96:6.
[22] Patrick Dep. Tr. 132:12-138:2; *see* JX16.
[23] *See* PX41.

## C. Fidelio, the Transaction, and the MIPA

In fall 2019, Patrick, Claude, and Fidelio began exploring a possible deal involving VOI.[24] Fidelio recently acquired two of VOI's competitors and was looking to expand its footprint in the veterinary orthopedics space.[25] As negotiations progressed, Fidelio hired Morrison Foerster ("MoFo") and Ernst & Young to conduct due diligence on VOI.[26]

From the outset, Fidelio had concerns about the Patent Litigation's potential impact on VOI.[27] Patrick told Fidelio, VOI "had a strong case [and] didn't infringe" DePuy's patents.[28] MoFo's diligence report estimated the potential Patent Litigation damages at $12-40 million.[29] Fidelio, however, felt "it was impossible to [] [] judge the risk"[30] – given DePuy's continual expansion of the Patent Litigation's scope.[31] As such, Fidelio was only willing to purchase VOI if Defendants provided "broad indemnification [] to cover any potential risk[] of th[e] [Patent] [L]itigation."[32]

---

[24] *Id.*
[25] DX566; 2/10/25 Tr. 65:12-66:3, 69:15-22, 180:14-181:22.
[26] *See* PX54; 2/10/25 Tr. 73:5-10; 2/11/25 Tr. 33:13-21.
[27] 2/10/25 Tr. 73:5-74:1; 2/11/25 Tr. 33:13-21.
[28] 2/10/25 Tr. 230:8-11; *see id.* 153:4-14.
[29] DX58.
[30] 2/10/25 Tr. 87:11-20.
[31] *See* 2/10/24 Tr. 154:3-8, 227:7-14 (testifying Defendants told Fidelio there was a high risk of NXT plates being added to the Patent Litigation).
[32] 2/11/25 Tr. 33:19-21; *see* 2/10/25 Tr. 68:6-69:2; D.I. 216, Ex. 27 (hereafter "Fitzgerald Dep. Tr." 97:8-98:16.

The parties executed the MIPA to effectuate the Transaction, which closed on June 16, 2022.[33] Under the MIPA, Plaintiffs agreed to pay Defendants $100 million to acquire VOI.[34] Several provisions of the MIPA are relevant to the parties' dispute.

At the center of Plaintiffs' claim is Section 8.2(a), which provides:

> from and after the Closing . . . [Defendants] shall severally (in proportion to their Percentage Interests)[35] but not jointly indemnify, defend and hold harmless the Buyer, its Affiliates[36] (including the Parent and the Company) . . . from and against any and all Damages arising out of ore relating to . . . any Damages suffered by the Company as a result of, or in connection with, the Patent Litigation[.][37]

The MIPA defines "Damages" as:

> any losses, liabilities, damages, awards . . . payments (including amounts paid in settlement), costs and expenses (including costs of investigation, preparation and defense, and the fees and disbursements of counsel), whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, together with interest with respect to any of the foregoing.[38]

"Patent Litigation" means:

---

[33] Pretrial Stip. at 13-14; *see* JX32 (hereafter "MIPA").

[34] MIPA §§ 2.3, Schedule 2.3. Fidelio generated the $100 million valuation using a 10x EBIDA multiplier – which was consistent with its recent acquisitions and priced VOI as if the Patent Litigation did not exist. 2/10/25 Tr. 69:3-70:3. The $100 million purchase price was broken into four components. *See* MIPA Schedule 2.3. Notably, one portion was a $20 million "Contingent Closing Note" (the "Note"), intended as the first source of Plaintiffs' indemnity for the Patent Litigation. *See id.* §§ 1 ("Contingent Closing Note"), 2.3, 5.5.

[35] The MIPA sets forth each Seller's Percentage Interest. *See* MIPA, Ex. 7. Relevant here, Claude's Percentage Interest is 46.296296% and the Trust's is 9.259259%. *Id.* As such, Defendant's combined Parentage Interest is 55.55%

[36] The MIPA defines "Affiliates" to mean "with respect to any Person, any other Person that directly, or indirectly . . . controls, is controlled by, or is under common control with, such first Person." *Id.* § 1 ("Affiliates").

[37] *Id.* § 8.2. Section 8.3 caps Defendants' aggregate total indemnity at $100 million. *Id.* § 8.3(a).

[38] *Id.* § 1 ("Damages").

the patent litigation pending in the United States District Court for the Middle District of Floria under the caption *DePuy Synthes Products, Inc. et al. v. Veterinary Orthopedic Implants, Inc.*, 3:18-cv-01342-HES-PDB (M.D. Fla.), together with any appeals therefrom and any related or derivative action.[39]

Defendants negotiated for various rights concerning the Patent Litigation.[40] Relevant here is the provision stating, "Sellers' Representative shall [] control the defense of the Patent Litigation . . . on behalf of the Company[.]"[41] Pursuant to the MIPA, Defendants appointed Patrick as Sellers' Representative.[42]

### D. VOI's Post-Transaction Business as the Patent Litigation Continues

After the Transaction closed, Fidelio united VOI with its other veterinary orthopedic companies to form Movora.[43] Patrick continued to run VOI's "day-to-day operations,"[44] reporting first to Movora's board and later to Vimian's[45] CEO.[46] During this period, VOI continued selling several of the plates at issue in the Patent Litigation.[47]

---

[39] *Id.* ("Patent Litigation").

[40] *See id.* § 5.5.

[41] *Id.* § 5.5(b).

[42] Pretrial Stip. at 14. The MIPA memorialized Patrick's role as VOI's post-Transaction CEO, stating Plaintiffs could terminate his "employment at any time with or without cause and without advance notice." MIPA, Ex. 3 § 1.1.

[43] 2/10/25 Tr. 66:9-67:8. Fidelio joined Movora with other companies in the animal health sector under the publicly traded company Vimian. *Id.* 66:9-67:22.

[44] 2/13/25 Tr. 57:10-59:11.

[45] Fidelio formed Vimian to run Movora along with other animal health companies. 2/10/25 Tr. 66:9-67:22.

[46] *See* D.I. 218, Ex. 8 (hereafter "Ullman Dep. Tr.") 16:25-21-19.

[47] *See* JX50 (damages expert presentation in Patent Litigation, discussing sales of accused plates post-Transaction); DX602 (discussing VOI's TPLO plates).

DePuy continued to expand the Patent Litigation.[48]  On June 8, 2021, DePuy filed its Second Amended Complaint, adding Fidelio as a defendant and alleging it willfully infringed DePuy's patents.[49]  Later the same month, DePuy filed its Third Amended Complaint ("TAC").[50]  The TAC added a new patent to the Patent Litigation – DePuy's newly issued U.S. Patent No. 11,026,728 (the "'728 Patent").[51] The '728 Patent is a continuation of the '921 Patent.[52]  The TAC alleged VOI's NXT plates infringed the '728 Patent.[53]

As DePuy expanded its case, the evidence shows Patrick controlled the Patent Litigation for VOI.[54]  Patrick: (1) initiated attempts to settle with DePuy;[55] (2)

---

[48] *See*, *e.g.*, DX189 (DePuy's second amended complaint in the Patent Litigation).

[49] *Id.*

[50] PX100.

[51] *Id.*

[52] *See* Trial Transcript February 13, 2025 (hereafter "2/12/25 Tr. 3") 19:9-20:18; PX100.0010 (DePuy's Third Amended Complaint alleging, "[t]he '728 patent is a continuation of the '921 patent and shares a common specification."), PX100.0073 ('728 Patent stating it is "a continuation of . . . Pat. No. 8,523,921.")

[53] PX100.

[54] Claude vigorously disputes the extent of Patrick's control over VOI's Patent Litigation defense. D.I. 284 (hereafter "Claude Br.") at 10-14, 27-29; D.I. 289 (hereafter "Claude Opp'n Br.") at 8-11, 20-22.  Specifically, Claude argues Plaintiffs "refus[ed] apportionment of liability between VOI and Fidelio in the [Patent] [L]itigation and at settlement." Claude Opp'n Br. at 20-22; *see* Claude Br. at 27-29.  Claude cites a myriad of documents to support that position. *See* DX179; DX 204; DX206; DX314; DX 350; DX380; DX409; DX433; DX440; DX479; DX624; DX651; DX654; DX701; DX724; DX733; PX118; PX127; PX157; PX200 JX51.  This evidence shows liability was never apportioned between Fidelio and VOI. *E.g.*, JX51.  Claude also proved a live controversy exists regarding whether an apportionment is necessary.  *See*, *e.g.*, DX701 (arguing the failure to apportion fault between VOI and Fidelio abrogated their indemnification obligation); PX200 (arguing any failure to apportion did not prevent Plaintiffs' entitlement to contractual indemnification).  For reasons discussed below, however, the Court finds Claude's proffered evidence does not prove Plaintiffs usurped control of the Patent Litigation from Patrick. *See infra* V.B.

[55] *See* 2/10/25 97:9-101:9; JX34.

9

switched VOI's counsel – hiring Finnegan, Henderson, Farabow, Garrett & Dunner ("Finnegan") to replace Fox Rothschild;[56] and (3) directed Finnegan's representation of VOI.[57] Patrick also helped develop VOI's next generation of plates, "Compresiv"/"Versiv" ("C/V").[58] As part of the redesign, Finnegan conducted a freedom to operate analysis regarding C/V.[59] Finnegan ultimately concluded C/V did not infringe DePuy's patents.[60] VOI used that analysis to attempt to settle with DePuy.[61] Moreover, Finnegan raised C/V in the Patent Litigation as non-infringing alternatives to mitigate potential damages.[62] In August 2022, VOI stopped selling Elite and NXT plates, and sought to convert customers to C/V.[63]

---

[56] *See* 2/10/25 Tr. 101:10-105:3; PX89; PX94; DX154. Finnegan jointly represented VOI and Fidelio in the Patent Litigation. PX91; PX92; PX93; PX95. The parties initially disputed how Finnegan should bill VOI and Fidelio for work related to the joint representation. *See* DX43. Ultimately, Patrick directed Finnegan to bill VOI for all work done. PX192.

[57] *E.g.*, 2/12/25 12:23-14:15, 40:13-22, 49:3-17.

[58] *See* 2/10/25 Tr. 113:12-116:8; PX93 (informing Claude of efforts to redesign certain VOI plates); JX42 (discussing VOI's efforts to redesign plates). The parties dispute the extent to which C/V were developed by VOI or BioMedtrix, another Fidelio-owned company under the Movora umbrella. *See* Claude Br. at 14-15 ("[Plaintiff]s' affiliate, BioMedtrix, conceived of and developed a new generation of plates; [C/V]." (citing DX698; DX712)); D.I. 283 (hereafter "Movora Br.") at 16 (arguing Patrick helped develop C/V). The Court is not convinced the extent of BioMedtrix's involvement in developing C/V is relevant. Plaintiffs concede BioMedtrix engineers helped design C/V. *See* 2/10/245 Tr. 113:12-116:13. Yet, it is also clear Patrick was involved in the redesign efforts. *See, e.g., id.* 116:14-16.

[59] *Id.* 116:19-23; 2/12/25 Tr. 25:16-26:11; PX93 (email from Patrick to Claude mentioning the Freedom to Operate study).

[60] 2/12/25 Tr. 26:6-11.

[61] PX194; *see* JX40 (email from May to Patrick, forwarded to Claude, noting DePuy was not interested in settling despite the C/V redesign).

[62] *See* PX103; PX197; DX386.

[63] JX44; 2/10/25 Tr. 115:8-18; Tr. 2/13/25 Tr. 59:12-62:2.

### E. The Patent Litigation Verdict, VOI's Post-Verdict Conduct, and the Settlement

As the Patent Litigation trial approached, Patrick, Finnegan, and Fidelio discussed the proposed jury verdict form.[64] Finnegan recommended "one lump sum for the amount of damages," because including separate lines for VOI and Fidelio "could result in a higher overall number."[65] Patrick approved Finnegan's recommendation.[66] Finnegan, however, submitted a proposed verdict form breaking liability down by plate, patent, and claim.[67] The Patent Litigation court rejected Finnegan's proposal, opting instead for "one question and one answer."[68]

The Patent Litigation trial occurred in January 2023.[69] The jury found both VOI and Fidelio liable for willful patent infringement and awarded DePuy's full requested damages, approximately $60 million.[70] Liability for the Patent Litigation was joint and several between VOI and Fidelio.[71] Because the jury found willful infringement, the verdict was subject to trebling.[72] Following the verdict, Finnegan recommended Fidelio and VOI appeal.[73] At the same time, VOI sent large shipments

---

[64] *See* 2/12/25 Tr. 71:9-74:19.
[65] *Id.*
[66] *Id.*
[67] DX380; DX433; DX440.
[68] DX491; *see* JX51.
[69] *See* DX486.
[70] JX51.
[71] PX100; 2/13/25 Tr. 44:7-13. The Patent Litigation jury verdict calculation was based on VOI's sales of Swiss, Elite, NXT, and CBLO plates. *See* 2/13/25 Tr. 11:3-12.
[72] *See id.* 10:19-11:2; 2/11/25 Tr. 210:13-19 (Claude testifying everyone was worried about the possibility of trebling).
[73] *See* DX550; 2/13/25 Tr. 95:6-112:20.

of C/V to customers.[74]  DePuy sought a TRO to stop this alleged "post-verdict 'fire sale' to flood the market with large quantities of the Infringing Implants."[75]  The Patent Litigation court ultimately enjoined VOI and Fidelio from selling any plate "not colorably different" from the infringing products.[76]  Unsatisfied with VOI and Fidelio's response to the Court's injunction, DePuy initiated contempt proceedings.[77]

With contempt proceedings and a motion to treble damages outstanding,[78] DePuy reached out to VOI's new CEO, Colleen Flesher ("Flesher"), to discuss settlement.[79]  With Patrick's approval, Flesher began settlement negotiations.[80] DePuy initially requested a $100 million payment and Plaintiffs' agreement to stop selling Swiss, Elite, NXT, CBLO, and C/V plates.[81]  Plaintiffs were hesitant to enter

---

[74] *See* 2/13/25 Tr. 64:8-68:1.  The parties dispute the nature of these shipments. *Compare* Claude Br. at 16-19, *with* Movora Br. at 26.  Plaintiffs contend the C/V shipments were part of VOI's ongoing annual order program, which VOI continue because there was no reason to believe the Patent Litigation prohibited C/V sales given the Finnegan freedom to operate opinion. 2/13/25 Tr. 62:20-68:1.  Claude stylizes the C/V shipments as product dumps similar to previous large shipments of Elite and NXT plates. *See* JX44.

[75] DX493.  VOI and Fidelio denied DePuy's allegations. DX508.

[76] DX658; DX698.

[77] DX610.

[78] Several witnesses testified the risk of trebling was "super high." *E.g.*, 2/13/25 Tr. 105:9-14.

[79] JX55.  Flesher worked for DePuy from 2012 until 2019. 2/13/25 Tr. 54:1-5.  During that period, Flesher worked with Maria Cunningham, who led settlement negotiations for DePuy. *Id.* 54:6-8, 58:10-17, 78:13-17.

[80] 2/13/25 Tr. 77:18-78:9; *see* JX56 (discussing Patrick's authorization of Flesher to negotiate but requiring Flesher to provide update to Patrick and allow Patrick to approve any settlement).

[81] 2/13/25 Tr. 93:1-94:22.  The Court notes a document on Defendants' initial exhibit list quoted DePuy's initial settlement offer at $90 million. *See* DX640.  Yet, that document was not admitted into evidence.  Accordingly, the Court relies on Flesher's trial testimony which priced DePuy's initial offer at $100 million.  DePuy previously voiced an intent to initiate a new lawsuit against VOI and Fidelio if they continued to sell C/V.  *See* DX583.0018.

any deal that prohibited selling C/V.[82]  After several rounds of negotiations,[83] DePuy sent a final $70 million settlement offer[84] which would expire an hour after issuance.[85]  Patrick reviewed the Settlement and met with VOI's post-trial counsel.[86] Patrick then approved the Settlement as Sellers' Representative.[87]  The Settlement resolved all outstanding Patent Litigation issues upon VOI's payment of $70 million,[88] which VOI financed via a loan.[89]  The Settlement also granted VOI and Fidelio a license to continue selling C/V.[90]

In April 2023, Plaintiffs demanded Defendants indemnify the Settlement, and related costs, pursuant to Section 8.2(a) of the MIPA.[91]  When Defendants refused, Plaintiffs initiated this litigation.[92]

## III.  RELEVANT PROCEDURAL HISTORY

Plaintiffs filed their Complaint on May 4, 2023, asserting a single breach of contract claim against all Defendants.[93]  On July 13, 2023, Claude answered the

---

[82] *See*, *e.g.*, DX662 (stating a settlement prohibiting the sale of C/V was "a last resort option.").
[83] *See* JX58; PX144; 2/13/25 Tr. 89:21-93:11.
[84] PX153.
[85] 2/13/25 Tr. 96:13-97:4.
[86] PX153; PX154; PX155.
[87] PX155; JX62.
[88] JX62; 2/13/25 Tr. 205:1-11.
[89] 2/10/25 Tr. 141:1-18.
[90] *See* JX62.
[91] PX157.
[92] 2/11/25 Tr. Tr. 213:3-12.
[93] D.I. 1.

Complaint,[94] asserting six Counterclaims – one alleging Plaintiffs breached the MIPA[95] and five seeking declaratory judgment.[96] Plaintiffs answered all Counterclaims on August 2, 2023.[97]

In October 2023, Claude filed a Motion for Judgment on the Pleadings,[98] which the Settling Defendants promptly joined.[99] While that motion was pending, the parties stipulated to Beale's dismissal after he settled with Plaintiffs.[100] On April 18, 2024, the Court denied the Motion for Judgment on the Pleadings, holding Plaintiffs' interpretation of the MIPA was reasonable and finding that Defendants' other arguments were premature.[101] Three weeks later, the parties stipulated to Van Horssen's dismissal after he also settled all claims with Plaintiffs.[102]

On June 13, 2024, while discovery was ongoing, the parties stipulated to Patrick's dismissal after he settled with Plaintiffs.[103]

---

[94] The Settling Defendants filed their Answer the day before, advancing the same six Counterclaims as Claude, as well as an implied covenant claim. D.I. 28.
[95] D.I. 31 ¶¶ 114-36 (alleging Plaintiffs breached Sections 5.5(b), 5.7, 8.2, and 8.3 of the MIPA).
[96] Specifically, Claude requested a declaration that: (1) Plaintiffs' breaches of the MIPA abrogated any indemnification obligation; (2) there is no obligation to provide indemnification if Damages exceed the cap in Section 8.3(a); (3) Defendants have no indemnity obligation, because damages exceed Section 8.3(a)'s cap; (4) Plaintiffs' failure to apportion Patent Litigation Damages invalidated their indemnification request; and (5) Defendants have no obligation to indemnify Plaintiffs for the Settlement. D.I. 31 ¶¶ 137-67.
[97] D.I. 39; D.I. 40.
[98] D.I. 76.
[99] D.I. 80.
[100] D.I. 130.
[101] D.I. 155.
[102] D.I. 166.
[103] D.I. 196.

The parties filed Cross-Motions for Summary Judgment in July 2024.[104] On December 2, 2024, the Court issued a memorandum opinion granting in part and denying in part Plaintiffs' Motion for Summary Judgment, while denying Defendants' Motion for Partial Summary Judgment (the "MSJ Op.").[105] The MSJ Op. resolved in Plaintiffs' favor: (1) Counterclaims Three, Four, Five Six; (2) Affirmative Defense Seven; and (3) Defendants' implied covenant claim.[106] Critically, the Court held "Plaintiffs, as the indemnitees, must prove their damages," but once Plaintiffs establish a prima facie case Defendants have the burden to "prove the MIPA does not cover [specific] 'non-recoverable' amounts."[107]

In advance of trial, Plaintiffs filed the sole Motion *in Limine* – seeking to exclude the testimony of Defendants' damages expert Jeffery Kinrich ("Kinrich").[108] At the January 30, 2025 pretrial conference, the Court deferred ruling on the admissibility of Kinrich's opinions until after trial.[109]

The Court held a five-day bench trial from February 10 through February 14, 2025.[110] The parties each filed an opening post-trial brief on March 28, 2025.[111] A

---

[104] D.I. 213; D.I. 214.
[105] D.I. 249 (hereafter "MSJ Op.").
[106] *See id.* at 26.
[107] *Id.* at 20 (citing *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545, 548 (Del. Super. 2005)).
[108] D.I. 256.
[109] D.I. 268 at 42:3-21.
[110] D.I. 274.
[111] Movora Br.; Claude Br.

month later, each party filed their post-trial response brief.[112]  The Court heard post-trial oral argument on May 13 and May 16, 2025.[113]

## IV.  STANDARD OF REVIEW

### A. The Burden of Proof

In a civil case, the burden of proof is by a preponderance of the evidence.[114] A preponderance of the evidence "means proof that something is more likely than not."[115]  Where "the evidence on any particular point is evenly balanced, the party having the burden of proof has not" sufficiently proved that point.[116]  The Court considers "the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them" to determine if any fact has been proven by a preponderance of the evidence.[117]

The plaintiff asserting a breach of contract claim has the burden of proof.[118] A court may shift the burden of proof to match a contractual allocation or

---

[112] D.I. 287 (hereafter "Movora Opp'n Br."); Claude Opp'n Br.

[113] D.I. 290; D.I. 291; D.I. 297 (hereafter "5/13/25 Tr."); D.I. 298 (hereafter "5/16/25 Tr.").  The transcripts, which are integral to the Court's decision, became available on June 16, 2025. D.I. 297; D.I. 298.

[114] *Zenith Energy Terminals Joliet Holdings LLC v. CenterPoint Properties Trust*, 2024 WL 3570165, at *13 (Del. Super. July 29, 2024).

[115] *Id.*; *see Sofregen Medical Inc. v. Allergan Sales, LLC*, 2024 WL 4297665, at *16 (Del. Sept. 26, 2024) ("[t]his means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes the Court believe that something is more likely true than not.").

[116] *Sofregen Medical*, 2024 WL 4297665, at *16.

[117] *Zenith Energy*, 2024 WL 3570165, at *13.

[118] *Buck v. Viking Holding Management Company LLC*, 2024 WL 4352368, at *7 (Del. Super. Sept. 30, 2024).

"accommodate the unique circumstance of the parties."[119] At summary judgment, the Court held Plaintiffs have the burden to prove their damages.[120] If Plaintiffs carry that burden, "Defendants . . . must prove that the MIPA does not cover [specific] 'non-recoverable' amounts."[121] This burden shifting "only makes a difference where the evidence is balanced."[122] If the evidence on any point is "so overwhelming [] the question of who had the burden of proof [] [] [is] irrelevant[.]"[123]

## B. The Court as Fact Finder

In a bench trial, "the judge sits as both arbiter of law and factfinder."[124] As factfinder, the judge evaluates "the witnesses' credibility and determine[s] what weight to assign their testimony."[125] The court is "free to accept or reject any or all of the sworn testimony, as long as it consider[s] all of the evidence presented."[126]

---

[119] *Id.* (citing *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *48 (Del. Ch. Nov. 30, 2020)).
[120] MSJ Op. at 20.
[121] *Id.*
[122] *Buck*, 2024 WL 4352368, at *7.
[123] *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1242-43 (Del. 2012).
[124] *Jackson v. State*, 21 A.3d 27, 38 (Del. 2011).
[125] *Torres v. Bishop*, 2021 WL 6053870, at *4 (Del. Super. Dec. 21, 2021) (citing *Mundy v. Devon*, 906 A.2d 750, 755 (Del. 2006)); *see Buck*, 2024 WL 4352368, at *7 ("[t]he Court can consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interest; the witnesses' manner or demeanor on the witness stand; and all circumstances that according to the evidence could affect the credibility of the testimony." (internal quotes omitted)).
[126] *Pardo v. State*, 160 A.3d 1136, 1150 (Del. 2017).

When the evidence is conflicting, the Court "retains discretion to determine which evidence deserves more weight."[127]

## V.  ANALYSIS

The Court first evaluates whether Plaintiffs proved their breach claim.  If so, the Court considers whether Claude demonstrated Plaintiffs breached the MIPA thereby voiding Claude's obligation to indemnify.  If not, the Court determines whether Defendants proved some portion of the Settlement is non-recoverable under Section 8.2(a).

### A. Plaintiffs Proved Claude Breached the MIPA by Not Indemnifying the Settlement.

Plaintiffs advance a single breach of contract claim – alleging Claude breached Section 8.2(a) of the MIPA by not providing indemnification for the Settlement.[128]  The elements of a breach of contract claim are: (1) a valid contract; (2) breach of a contractual obligation; and (3) resultant damages.[129]  No Party challenges the MIPA's validity.  The MSJ Op. noted, "Defendants do not meaningfully dispute that their failure to indemnify some portion of the Settlement is a breach of the MIPA."[130]  At post-trial oral argument, Claude conceded he breached the MIPA by not indemnifying certain portions of the Settlement covered

---

[127] *Unico Commodities, LLC v. Lofty Links, LLC*, 2025 WL 638631, at *4 (Del. Super. Feb. 25, 2025).
[128] *See* Compl. ¶¶ 41-51.
[129] *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).
[130] MSJ Op. at 16.

by Section 8.2(a).[131]  Accordingly, the only dispute regarding Plaintiffs' breach claim is whether Plaintiffs proved Section 8.2(a) covers the entire Settlement.

Plaintiffs argue they proved a prima facie case that the entire Settlement falls within the MIPA's "exceptionally broad" indemnification provision.[132]  Plaintiffs cite: (1) whom the MIPA indemnifies;[133] (2) the forms of damages covered;[134] (3) the subject-matter indemnified;[135] and (4) the period covered,[136] as confirming the entire Settlement is indemnifiable.  Plaintiffs also cite "the commercial context" of the Transaction as confirming the entire Settlement is indemnifiable.[137]

---

[131] 5/13/25 Tr. 160:16-162:2; *see* Claude Opp'n Br. at 12 ("[t]he Parties indemnification agreement does not include the '728 Patent or NXT. At the time of the MIPA the Patent Litigation involved one patent–the '921 Patent–and three accused plates–Swiss, Elite, and CBLO."), 46 ("[t]he business [Defendants] provided was one that sold three TPLO/CBLO plates alleged to infringe the '921 Patent . . . and [Defendants] agreed to provide a remedy for that business–indemnity for pre-closing liability for these sales and for post-closing liability for the reasonable and expected continuation of those sales."), 48 ("[t]he only 'dispute' that [Defendants] could, and did, indemnify was DePuy's 921 Patent infringement claims against VOI's Swiss, Elite, and CBLO plates.").

[132] Movora Br. at 31-35 (citing MIPA § 8.2(a)).

[133] *Id.* at 32 (noting the MIPA indemnifies "Buyer" and "its Affiliates." (quoting MIPA § 8.2(a)).

[134] *Id.* (noting the MIPA defines "Damages" to include "any losses, liabilities, damages, [and] awards" as well as "amounts paid in settlement," "fees and disbursements of counsel," and "interest." (quoting MIPA §1 ("Damages"))).

[135] *Id.* at 33.  Plaintiffs assert the provision broadens coverage in three ways. *Id.* First, the MIPA defines "Patent Litigation" to include "any related or derivative Actions." MIPA §1 ("Patent Litigation").  Second, Section 8.2(a) coves "Damages suffered by [VOI] *as a result of, or in connection with*, the Patent Litigation." MIPA § 8.2(a) (emphasis added). Finally, the clause "arising out of or relating to" means Section 8.2(a) must be read broadly. *Id.*; *see* MSJ Op. at 19-20 n.117.

[136] Movora Br. at 33-35.  Plaintiffs insist Section 8.2(a)'s language shows the provision is forward-looking. *Id.* at 33-34; *see* MIPA § 8.2(a) ("from and after the Closing," "all Damages arising out of", "appeals . . . related. . . [or] derivative[.]"). *See also* MIPA § 1 ("Damages") ("whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued.").

[137] Movora Br. at 34-35.  Specifically, Plaintiffs assert Fidelio would not have entered the Transaction "unless [Defendants] agreed to keep all the risk" associated with the "ever-expanding [P]atent [Litigation]." *Id.* (citing 2/10/25 Tr. 68:16-69:2, 87:11-20 ("it was impossible to . . . judge the risk."); 2/11/25 Tr. 33:13-21).  Plaintiffs point to Fidelio's use of a 10x EBITDA valuation

Claude asserts Section 8.2(a) "indemnif[ies] [Plaintiffs] for DePuy's claims relating to conduct and occurrences through the sale of VOI, when [Defendants] controlled the business, and the reasonable and expected continuation of that conduct."[138] Claude contends Plaintiffs' reading of Section 8.2(a) impermissibly broadens the indemnification provision "to be essentially limitless."[139] Claude acknowledges Section 8.2's broad language, but insist "these phrases do not encompass anything and everything added to the Patent Litigation case number."[140] Claude also take issue with Plaintiffs' interpretation of the "commercial context."[141] Instead, Claude argues each indemnifiable portion of the Settlement "requires a causal connection to the Patent Litigation pending at the time of the MIPA."[142]

---

when calculating the purchase price as confirmation that Plaintiffs valued the Transaction "completely exclude[ing] the risk and potential liabilities relating to the" Patent Litigation. 2/10/25 Tr. 69:3-18; *see* Fitzgerald Dep. Tr. 209:15-210:2; 2/10/25 Tr. 69:15-70:2(noting a 10x EBITDA valuation was standard for companies not undergoing major litigation).

[138] Claude Br. at 32-34 (citing MIPA §§ 1 ("Patent Litigation"); 8.2(a)).

[139] Claude Opp'n Br. at 22-25; *see* Claude Br. at 32-34 (arguing Plaintiff's interpretation is "illogical" (citing 2/11/25 Tr. 68:3-69:8 (asserting Section 8.2(a) covers "any claims . . . brought under [the Patent Litigation] case number . . . regardless of who the parties are . . . [and] what the claims are[.]"))).

[140] Claude Opp'n Br. at 23-24; *see* Claude Br. at 23 ("the parties did not contemplate a provision where [Plaintiffs] could ramp up liability with impunity.").

[141] Claude Opp'n Br. at 26-27. Claude first argues Bonnier's testimony that it was impossible to judge the Patent Litigation risk is contradicted by Buyer's extensive due diligence pre-Transaction. *Id.* at 26. Second, the $100 million purchase price "was driven by VOI's commercial success." *Id.* at 26-27. Finally, Claude argues it was Plaintiffs' responsibility pre-closing to confirm the indemnification provision covered all forward-looking conduct. *Id.* at 27.

[142] *Id.* at 23-24 (citing *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1257 (Del. 2008)).

Plaintiffs dispute Claude's interpretation of the MIPA's indemnification provision's scope.[143] Instead, Plaintiffs assert the MIPA's definition of Patent Litigation shows indemnification is limited to a particular case number, not a point in time.[144] Plaintiffs insist any post-Transaction claims asserted by DePuy are at least "related or derivative claims" to the Patent Litigation.[145]

The starting point for interpreting the scope of Defendants' indemnification obligation is the MIPA's text.[146] Section 8.2(a) provides in relevant part:

> the Sellers shall severally (in proportion to their Percentage Interest) but not jointly indemnify, defend and hold harmless the Buyer, [and] its Affiliates . . . [from] any Damages suffered by the Company as a result of, or in connection with, the Patent Litigation[.][147]

The MIPA defines "Damages" as:

> any losses, liabilities, damages, awards, . . . payments (including amounts paid in settlement), costs and expenses (including costs of investigation, preparation and defense, and the fees and disbursements of counsel), whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, together with interest with respect to any of the foregoing.[148]

---

[143] Movora Opp'n Br. at 8-13.
[144] *Id.* at 9 (citing MIPA § 1 ("Patent Litigation")). The MIPA also provides indemnification for Damages suffered "as a result of, or in connection with" the Patent Litigation. MIPA § 8.2(a).
[145] *Id.* at 9-11 (internal quotes omitted).
[146] *See First Solar, Inc. v. National Union Fire Insurance Company of Pittsburg, PA*, 274 A.3d 1006, 1013 (Del. 2022) ("the scope of an insurance policy's coverage is prescribed by the language of the policy." (cleaned up)).
[147] MIPA § 8.2(a).
[148] *Id.* § 1.1 ("Damages").

"Affiliate[s]" means "with respect to any Person, any other Person that directly, or indirectly . . . controls, is controlled by, or is under common control with, such first Person."[149]  Critically, the Parties defined "Patent Litigation" as:

> the patent litigation pending in the United States District Court for the Middle District of Florida under the caption *DePuy Synthes Products, Inc. et al. v. Veterinary Orthopedic Implants*, Inc., 3:18-cv-01342-HES-PDB (M.D. Fla.), together with any appeals therefrom and any related or derivative Actions.[150]

In the MSJ Op., the Court interpreted these provisions to provide the "broadest possible" indemnification.[151]  Claude admits Section 8.2(a)'s language "is broad."[152]  Yet, Claude insists he is only required to indemnify "the [P]atent [L]itigation at the time the MIPA was entered into, not anything and everything that could come later."[153]  The Court, however, finds the MIPA provides no textual support for Claude's proffered temporal limitation.

Claude's indemnification obligation is not limited to the Patent Litigation's scope when the Transaction closed.  The plain text of Section 8.2(a) ties Plaintiffs' recoverable indemnity to the Patent Litigation without referencing any point in time.[154]  Rather, the phrase "in connection with" in Section 8.2(a) suggests the right

---

[149] *Id.* § 1.1 ("Affiliates").

[150] *Id.* § 1.1 ("Patent Litigation").

[151] MSJ Op. at 19-20 (citing *Lillis v. AT & T Corp.*, 904 A.2d 325, 332 (Del. Ch. 2006)).

[152] 5/13/25 Tr. 160:1-4.

[153] *Id.* 160:4-7.

[154] *See* MIPA § 8.2(a); *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 683 (Del. 2013) (holding courts "interpret clear and unambiguous contract terms according to their plain meaning.").

to indemnification is not temporally limited.[155] The MIPA's extensive "Damages" definition – which includes "unknown," "unasserted," "contingent," and "unaccrued" losses – further suggests Claude's interpretation of Section 8.2(a) is incorrect. Unrebutted trial testimony confirms that suggestion. Guhan Subramanian ("Subramanian"), Plaintiffs' mergers and acquisitions expert, testified Section 8.2(a) does not establish a "my watch, your watch" indemnification scheme.[156] Instead,

---

[155] *See Lillis*, 904 A.2d at 332 (holding the phrase "in connection with," "clearly envisions that any dispute plausibly related to [the expressly covered conduct] is withing the purview of" an indemnification provision.").

[156] Trial Transcript February 14, 2025 (hereafter "2/14/25 Tr.") 27:4-29:10. Claude attempts to argue his interpretation of Section 8.2(a) is not a "my watch, your watch approach" because Defendants "agreed to indemnify post-closing conduct (on [Plaintiff]s' watch) to the extent that conduct was a reasonable and expected continuation of pre-closing conduct." Claude Opp'n Br. at 46-47. The Court, however, is not convinced that Claude advances a meaningful distinction. Claude interprets the MIPA such that Section 8.2(a) does not "immunize [Plaintiffs] from their own business decisions." *Id.* at 46; *see* Claude Br. at 32-34. Splitting recoverable indemnity into damages relating to conduct that occurred pre- versus post-Transaction is plainly a "my watch, your watch" arrangement. *See J.B. Hanks Co., Inc. v. Shore Oil Co.*, 2014 WL 268698, at *12 & n.126 (M.D. La. Jan. 23, 2014) (interpreting a provision which read "[a]ll accounts payable, royalties, severance taxes and other costs and expenses with respect to the Seller's interest in the Assets which relate to the period prior to the Effective Date shall be the obligation of and be paid by Seller, and those which relate to the period commencing with the Effective Date shall be the obligation of and be paid by Purchaser" to be a "my watch, your watch" arrangement); *Williams Alaska Petroleum, Inc. v. State*, 529 P.3d 1160, 1203 (Alaska 2023) (holding it was reasonable to interpret a contractual provision as "your watch/my watch" because "liabilities were defined by their known/unknown status[.]"). *See also* 2/14/25 Tr. 25:9-27:3 (testifying regarding what a "my watch, your watch" indemnity scheme means).

Similarly, the Court rejects Claude's efforts to discredit Subramanian's testimony. Claude argues Subramanian's testimony "repeatedly 'cross[ed] the line' and 'invade[d] the province of the court,' including by 'effectively interpreting the agreement using extrinsic evidence.'" Claude Opp'n Br. at 47-48 (quoting *In re Columbia Pipeline Grp., Inc. Merger Litig.*, 2022 WL 2902769, at *4 (Del. Ch. July 14, 2022) (edits in original) (excluding Professor Subramanian's opinions in a separate action on that basis)). Certainly, an expert cannot testify regarding the interpretation of a contract as a matter of law or the parties' subjective intent when entering into an agreement. *See Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1994 WL 721624, at *1 (Del. Super. Apr. 20, 1994); *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2010 WL 1676442, at *2 (Del. Ch. Apr. 21, 2010). Subramanian did not cross the line of permissible expert testimony.

Subramanian confirmed Section 8.2(a) sets forth a broad, forward-looking, indemnification obligation.[157]  Taken together, this evidence convinces the Court Section 8.2(a) does not limit Plaintiffs' recoverable indemnity to Damages related to the Patent Litigation as it existed when the Transaction closed.

The only textual evidence Claude cites to argue otherwise is the word "pending" in the MIPA's definition of "Patent Litigation."[158]  Dictionaries define "pending" as "[r]emaining undecided; awaiting a decision."[159]  The Supreme Court of Delaware has endorsed a similar definition.[160]  Thus, the MIPA's use of the word "pending" conveyed the Patent Litigation was ongoing and remained undecided when the Transaction closed.  As a "pending" lawsuit, the Patent Litigation's scope could change dramatically.[161]  Therefore, rather than limiting Claude's

---

The Court therefore Court credits Subramanian's testimony regarding how contracting parties typically structure "my watch, your watch" indemnification provisions, and how Section 8.2(a) differs from those representative examples. *See* 2/14/25 Tr. 27:4-30:17.  The *In re Columbia Pipeline* case Claude cites explicitly endorsed such testimony as proper. *See In re Columbia Pipeline*, 2022 WL 2902769, at *4 ("[t]here are many ways in which Subramanian might have provided helpful expert opinions about [the relevant agreements].  He could have analyzed the prevalence of [the at-issue provision] in the marketplace.  He might have collected data on and analyzed whether there are different formulations of [the at-issue provision], then evaluated how tight or loose the different formulations are.").

[157] 2/15/25 Tr. 28:5-22.

[158] *See* Claude Opp'n Br. at 22-25; 5/13/25 Tr. 160:12-15.

[159] *Pending*, BLACK'S LAW DICTIONARY (11th ed. 2019); *accord Pending*, MIRRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/pending (last visited June 6, 2025). *See also Consolidated, LLC v. GFP Cement Contractors, LLC*, 2023 WL 3496188, at *3 (Del. Super. May 15, 2023) ("'[u]nder well-settled law,' the Court may use dictionaries to ascertain the meaning of undefined contract terms." (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) (edits in original)).

[160] *See Rice v. McCaulley*, 31 A. 240, 243 (Del. 1885).

[161] *See BDO USA, LLP v. JSCo Enterprises, Inc.*, 2023 WL 5206150, at *11 (Del. Super. Aug. 8, 2023) ("parties are allowed to adapt their positions around changed circumstances over the course

indemnification obligation, the Court interprets the word "pending" as acknowledging the Patent Litigation was ongoing and subject to change.[162] That construction comports with the circumstances when the parties negotiated the Transaction – namely DePuy's continuing expansion of the Patent Litigation.[163] Accordingly, Claude's reliance on the Patent Litigation definition does not support temporally limiting Section 8.2(a)'s scope. The Court finds Plaintiffs met their prima facie burden of showing the entire Settlement falls within the MIPA's indemnification provision. As such, the burden shifts to Claude to prove either some countervailing breach by Plaintiffs or specific non-recoverable portions of the Settlement.

---

of a case."); *CIM Urban Lending GP, LLC v. Cantor Commercial Real Estate Sponsor, L.P.*, 2016 WL 768904, at *4 n.22 (Del. Ch. Feb. 26, 2016) ("the scope of the dispute among the parties will likely evolve, and the appropriateness of this discovery may become more apparent later."); *Delta Eta Corp. v. University of Delaware*, 2007 WL 4578278, at *6 (Del. Super. Dec. 27, 2007) ("[a]s litigation proceeds, the parties' positions may change as the factual record becomes more complete."); *State Farm Fire & Cas. Co. v. Maltman ex rel. Maltman*, 1976 WL 168381, at *2 (Del. Super. June 22, 1976) (recognizing "the tendency of factual patterns to shift during the course of litigation prior to trial[.]").

[162] This reading is consistent with the fact that Claude, Patrick, and their Patent Litigation Counsel knew pre-closing that DePuy was aggressively expanding the Patent Litigation and was likely to accuse additional VOI plates. *See supra* n.17; *Chicago Bridge & Iron Company N.V. v. Westinghouse Electric Company LLC*, 166 A.3d 912, 926-27 (Del. 2017) (holding a "[p]urchase [a]greement" should be "read in full and *situated in the commercial context between the parties*." (emphasis added)).

[163] *See*, *e.g.*, PX65 (noting, pre-Transaction, DePuy was likely to add NXT plates to the Patent Litigation). Interpreting Section 8.2(a) to provide comprehensive, forward-looking indemnity is consistent Fidelio's 10x EBIDA valuation of VOI. Tr. 1, 69:3-70:3 (testifying the $100 million purchase price was consistent with Fidelio's valuation of other companies and priced VOI as if the Patent Litigation did not exist).

**B. Claude did Not Prove Plaintiffs Materially Breached the MIPA, thereby Obviating Defendants' Indemnification Obligation.**

Claude asserts Plaintiffs' material breach of the MIPA abrogates any obligation to indemnify the Settlement.[164] It is axiomatic that "[a] party is excused from performance under a contract if the other party is in material breach thereof."[165] Claude contends Plaintiffs breached Section 5.5(b) of the MIPA by usurping control of the Patent Litigation from Sellers' Representative, Patrick.[166] Section 5.5(b) states, "Sellers' Representative shall [] control the defense of the Patent Litigation and any settlement negotiations relating thereto on behalf of [VOI.]"[167]

Claude argues Plaintiffs' refusal to permit apportionment of Damages in the Patent Litigation between VOI and Fidelio materially breached Section 5.5(b).[168] Claude insists the evidence shows Plaintiffs repeatedly refused[169] Patrick's numerous apportionment requests.[170] While Patrick approved the Settlement,

---

[164] 2/10/25 Tr. 40:5-41:2 ("[w]e will show that Plaintiffs breached section 5.5 in two ways.").

[165] *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. Oct. 1, 2003) (citations omitted).

[166] Claude Br. at 27-31 (citing MIPA § 5.5(b)). Patrick's control of the Patent Litigation as Sellers' Representative is central to Defendants' breach claim. *See id*; Claude Opp'n Br. at 20-22. Movora points out, however, "Claude failed to product Patrick at trial" despite representing at summary judgment that Patrick would testify regarding his lack of control. Movora Br. at 58. Per Plaintiffs, such testimony was needed to overcome Patrick's deposition statements that Finnegan never failed to follow his directions related to the Patent Litigation. *See* Patrick Dep. Tr. 307:4-18.

[167] MIPA § 5.5(b).

[168] Claude Br. at 27-31 (citing MIPA § 5.5(b); *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013); *Int'l Underwriters, Inc. v. Stevenson Enters., Inc.*, 1983 WL 935827, at *2 (Del. Super. Oct. 4, 1983)).

[169] *See* 2/10/25 Tr. 123:10-20; 2/11/25 Tr. 37:4-22; DX479; DX654; DX651; DX701.0003; PX127; DX624; PX200.

[170] *See* DX179; DX204; DX206; DX314; DX350; DX409.

Claude maintains he did so while noting Plaintiffs' failure to apportion voided any indemnification obligation.[171]

Plaintiffs insist Claude failed to prove a material breach.[172] Plaintiffs argue multiple witnesses testified "Patrick controlled all defense decisions for VOI," including a Finnegan lawyer who represented VOI and Fidelio in the Patent Litigation.[173] Rather, Plaintiffs assert the evidence shows Patrick agreed to not apportion damages in the Patent Litigation, because Finnegan advised him doing so "could result in a higher overall number[.]"[174] Plaintiffs further maintain Claude did not prove any alleged breach was material.[175] Plaintiffs insist requesting apportionment "would not have made a difference," because the Patent Litigation judge made clear he wanted a simple verdict form.[176]

---

[171] Claude Br. at 29 (citing JX57; JX59; DX695; PX151; PX155).

[172] Movora Br. at 58-60 (citing *I/Mx Info. Mgmt. Sols., Inc. v. MultiPlan, Inc.*, 2013 WL 3322293, at *6 (Del. Ch. June 28, 2013) (holding a breach is material if it is "so fundamental" that it "defeats the essential purpose of the contract")).

[173] *Id.* at 58-59; *see* 2/10/25 Tr. 112:9-113:11; 2/13/25 Tr. 57:13-21; *id.* 225:20-226:2; 2/12/25 Tr. 12:23-14:15, 40:13-22, 49:3-17.

[174] Movora Br. at 59 (quoting 2/12/25 Tr. 74:11-19) (citing 2/12/25 Tr. 71:9-15 (Patrick agreed "to just have one lump sum for the amount of the damages."); PX245). Because Patrick had the right to control VOI's defense regardless of its impact on damages," Claude maintains any risk of apportionment increasing the Patent Litigation jury award does not excuse Plaintiffs' breach. Claude Opp'n Br. at 22 (arguing higher damages were not possible, because "the jury awarded the full damages amount sought by DePuy." (citing DX610)).

[175] Movora Opp'n Br. at 43-45 ("[w]here the evidence shows that the breach was 'of no consequence' to the outcome, the breach is immaterial." (quoting *Matthew v. Laudamiel*, 2014 WL 5499989, at *2 (Del. Ch. Oct. 30, 2014))).

[176] Movora Br. at 59-60. Specifically, Plaintiffs argue the evidence shows the judge rejected Finnegan's proposed complex verdict sheet, stating "[i]t's going to be one question and one answer. We're not going to break it down." DX491.0141; *see* DX380; DX433; DX440. Claude rejects Plaintiffs' reliance on Finnegan's proposed verdict forms – which supposedly did not comply with

Claude did not prove Plaintiffs breached Section 5.5(b) by usurping control of the Patent Litigation from Patrick.[177] The overwhelming evidence shows Patrick controlled VOI's Patent Litigation Defense.[178] Tim May, a member of the joint Patent Litigation defense team,[179] testified Finnegan always took direction from Patrick, who approved all defense decisions regarding VOI.[180] Patrick's control included approving the single item, non-apportioned jury verdict form.[181] At his deposition, Patrick could not identify a single direction Finnegan refused to follow regarding VOI's representation in the Patent Litigation.[182] This statement is even more striking given Patrick's notable absence from trial prevented him from clarifying or explaining his deposition testimony.[183] Taken together, this largely

---

Defendants' apportionment request. *Id.* at 20-21 (citing 2/13/25 Tr. 47:23-48:23 (acknowledging an apportionment could be done)).

[177] Because the Court concludes Claude did not prove Plaintiffs breached the MIPA, it need not evaluate whether the alleged breach would have been material.

[178] *See* 2/10/25 Tr. 112:22-113:11; 2/13/25 Tr. 57:13-21 ("I was given really clear direction from both Patrick and from Fredrick Ullman, my direct manager, that Patrick would be leading the process of the [Patent] [L]itigation."); 2/13/25 Tr. 223:18-226:2. *See also* 2/10/25 Tr. 112:2-21 (explaining why Fidelio had certain calls with Finnegan without Patrick); 2/10/25 Tr. 113:12-115:11 (discussing Patrick's control over specific aspects of VOI's Patent Litigation defense – namely C/V as non-infringing alternatives).

[179] *See* 2/12/25 Tr. 53:7-56:16 (May testifying he was "not the first-chair litigator," but a member of the defense team).

[180] 2/12/25 Tr. 12:23-14:15; 40:17-22, 49:3-17.

[181] 2/12/25 Tr. 71:9-15, 74:11-19.

[182] Patrick Dep. Tr. 370:4-24 ("Q. And what did you ask them to do that they didn't do? A. [Patrick] I forget.").

[183] Patrick's non-appearance at trial directly contradicted Defendants' representation at summary judgment that they would "put [documents] in front of [Patrick] at trial . . . [to] make clear that [Finnegan] did not respect the direction that [Patrick] was providing to them at times during" the Patent Litigation. D.I. 244 (Summary Judgment hearing transcript) 58:17-59:9.

unrebutted testimony shows Patrick controlled VOI's Patent Litigation defense and specifically approved the non-apportioned jury verdict form.

Faced with this substantial evidence, Claude relies on a series of communications in which Patrick allegedly requested an apportionment of fault between VOI and Fidelio,[184] but Plaintiffs refused.[185] Some of Claude's proffered evidence, however, only tangentially references apportionment.[186] The vast majority of other documents Claude cites are indemnification claim notices/demands and subsequent counterparty responses.[187] Questions regarding the reliability of

---

[184] *See* Claude Br. at 28 (citing DX179; DX204; DX206; DX314; DX350; DX409; DX479; DX624 DX651; DX654; DX701; DX721; DX724; DX733; PX127; PX157; PX200).

[185] *See id.* (citing PX118; 2/10/25 Tr. 123:10-20; 2/11/25 Tr. 37:4-14, 20-22).

[186] *See* DX179 (Patrick emailing Finnegan and Bonnier, "[i]n my view any material amendments to th[e] [Patent] [L]itigation should not be burdened by the previous ownership," but not requesting apportionment. Instead, asking "[h]ow do you propose we deal with this? Theo what are your thoughts on this?"); DX204 (Patrick emailing Bonnier "I feel Fidelio being added to the case and the new patent being issued should force us to rethink our approach," but suggesting "Finnegan make J&J a 7M offer to settle" not apportionment); DX206 (Wells emailing Klein, "I also understand from Patrick that the litigation may now include claims related to actions taken by Ossium/VOI following the closing and that I was not sure if they related to the status of facts at the closing on June 16, 2020, that are subject to the indemnification obligation," but not mentioning or requesting any apportionment of fault); 2/10/25 Tr. 123:10-20 (testifying Plaintiffs' "completely disputed" Defendants' "claim notices" sent "after Patrick resigned" as VOI's CEO, but not stating Plaintiffs refused to allow Patrick to direct Finnegan to request apportionment of damages).

[187] *See* DX350 (12/5/22 claim notice); DX409 (1/3/23 response to claim notice dispute); DX479 (1/18/23 response to indemnification request); DX624 (2/10/23 response to updated claim notice); DX651 (3/20/23 response to fourth indemnification claim notice); DX654 (3/16/23 response to indemnification demand); DX701 (4/21/23 response to fifth indemnification claim notice); DX721 (4/5/23 reply to indemnification demand response); DX724 (4/10/23 further rejection of claim notices); DX733 (5/11/23 further rejection claim notices); PX118 (12/5/22 indemnification claim notice); PX127 (1/19/23 further indemnification demand and response); PX157 (4/14/23 updated indemnification claim notice); PX200 (3/7/23 reply to indemnification response).

documents prepared in anticipation of a dispute aside,[188] these documents do not support Claude's breach claim. While the indemnification demands and responses extensively outline the parties' positions on the issue, they do not show Plaintiffs prevented apportionment or usurped control of the Patent Litigation.[189]

Claude heavily relies on Tom Wells' ("Wells") November 21, 2022, email to Klein, cc'ing Patrick and Bonnier.[190] In that email, Wells stated "[t]he liability attributable to the Patent Litigation needs to be apportioned to seller indemnifiable amounts and buyer non-indemnifiable amounts."[191] Yet, nothing in that email, or any document Defendants cite, objectively shows Patrick told Finnegan to seek apportionment and Plaintiffs prevented honoring that request. Indeed, none of the communications were directed towards Finnegan or included them as a recipient. As such, Claude has not overcome the overwhelming trial testimony showing Patrick's complete control of VOI's Patent Litigation defense. Accordingly, Defendants did not prove Plaintiffs breached the MIPA by a preponderance of the evidence. The Court enters judgment in Plaintiffs' favor on Claude's breach

---

[188] *See LaPoint v. AmerisourceBergen Corp.*, 2007 WL 2565709, at *1 (Del. Ch. Sept. 4, 2007) ("I place the greatest weight on documents . . . prepared by a party (or agent of a party) *before any anticipation of litigation*." (emphasis added)).

[189] *See* DX179; DX204; DX206; DX350; DX409; DX 479; DX624 DX651; DX654; DX701; DX721; DX724; DX733; PX127; PX157; PX200; PX118.

[190] *See* DX314. Tom Wells was one of Defendants' transactional attorneys involved in the Transaction.

[191] *Id.* at 0002.

counterclaim and concludes Claude's indemnification obligation is not abrogated by any countervailing material breach.

## C. The Only Non-Recoverable Component of the Settlement is the C/V License.

Claude does not dispute they must indemnify certain portions of the Settlement.[192] Claude admits he owes indemnity for Damages attributable to "DePuy's claims that the Swiss, Elite, and CBLO plates infringed the '921 Patent."[193] Nevertheless, Claude maintains the Settlement includes four non-recoverable components.[194] Specifically, Claude challenges Plaintiffs' entitlement to Damages: (1) associated with C/V; (2) attributable to Fidelio; (3) due to alleged post-Transaction willful misconduct; and (4) tied to the '728 Patent.[195]

---

[192] *See* 5/13/25 Tr. at 160:16-162:2 ("conced[ing]" an obligation to indemnify "the plates [accused] at the time [the parties' executed the MIPA] [] that infringed the 921 patent[.]"); Claude Opp'n Br. at 23.

[193] Claude Opp'n Br. at 23; *see id.* at 12 ("[a]t the time of the MIPA, the Patent Litigation involved one patent–the '921 Patent–and three accused plates–Swiss, Elite, and CBLO."). The parties dispute the quantum of damages attributable to Swiss, Elite, and CBLO. *Compare* 5/16/25 Tr. at 7:13-9:1 (Plaintiffs arguing Swiss, Elite, and CBLO accounted for "54.3 million of the 59.5 million jury verdict" in the Patent Litigation, which corresponds to "91 percent of the whole exposure[.]"), *with id.* at 59:8-60:10 (Defendants arguing the "the 54 million number isn't accurate. It needs to be reduced" to account for "profits, Fidelio's role, and the willful misconduct[.]").

[194] *See* Claude Br. at 31-44.

[195] *See id.*

1. Plaintiffs Can Recover Damages Associated with the C/V Release, but Not the C/V License.

Claude argues Plaintiffs cannot recover portions of the Settlement attributable to C/V.[196] Claude insists Plaintiffs are not entitled to indemnification for the release of liability triggered by Plaintiffs' "decision to flood the market with C/V on the heels of the jury verdict" for two reasons.[197] First, Claude insists the release is not connected to the Patent Litigation.[198] Second, Claude contends the release is not "Damages," because "VOI and Fidelio never incurred any obligation to pay DePuy for the C/V sales."[199] Claude maintains the "purely forward-looking" C/V license is not indemnifiable, because a "license" is not included in the "Damages" definition and "a license [] [] is not damages '*suffered* by [VOI].'"[200]

Plaintiffs insist C/V plates relate to the Patent Litigation, such that Section 8.2(a) covers the license and release.[201] Plaintiffs argue C/V are VOI products, which Patrick helped develop "to try to avoid DePuy's patents."[202] Patrick injected

---

[196] Claude Br. at 34-37. Claude asserts C/V were designed by BioMedtrix after the Transaction. *Id.* at 34-35 (citing JX62.003; 2/12/25 Tr., 57:2-10).
[197] *Id.* at 34-36.
[198] *Id.* at 35-36 ("C/V neither existed at the time of the MIPA . . . nor were ever accused products in the Patent Litigation." (citing 3/12/25 Tr. 82:2-8; JX50.0041.). Claude notes Plaintiffs described C/V as "a new generation of plates out of scope in this dispute." DX386.
[199] Claude Br. at 36.
[200] *Id.* at 36-37 (emphasis added) ("[Plaintiffs] could have stopped selling C/V upon settlement, thus eliminating any possible damages after that date, obviating the need for a license.").
[201] Movora Opp'n Br. at 25-29.
[202] *Id.* at 25 (citing 2/13/25 Tr. 60:21-61:11; PX103; 2/10/25 Tr. 113:12-115:7; 2/13/25 Tr. 182:20-183:1; Ullman Dep. Tr. 45:3-13).

the C/V plates into the Patent Litigation as "non-infringing alternatives."[203] Therefore, "there was no realistic way to settle the Patent Litigation without ensuring peace as to [C/V]."[204] Plaintiffs also assert the term "injunctions" in the MIPA contemplates a forward-looking license.[205]

Claude counters Plaintiffs' arguments regarding C/V for four main reasons.[206] First, the MIPA does not expressly cover the license or require Claude to pay for the right to continue selling an accused product.[207] Second, Defendants had no control over Plaintiffs' post-closing decision to develop C/V, which were never accused in the Patent Litigation.[208] Third, although C/V were never subject to an injunction, the MIPA nevertheless does not indemnify a license to overcome an injunction.[209] Fourth, Patrick's involvement in developing C/V is immaterial, because he worked as VOI's CEO at the time.[210]

Claude's arguments concerning C/V are properly evaluated in two parts. First, Claude argues Plaintiffs cannot recover any portion of the Settlement attributable to releasing Plaintiffs from liability associated with post-Transaction sales of C/V. The

---

[203] *Id.* at 27-29 (citing PX194; PX103; PX197; DX386; DX610).
[204] *Id.* at 29.
[205] Movora Br. at 39 (citing MIPA § 8.2(a); 2/11/25 Tr. 18:21-20:13 (Klein)).
[206] Claude Opp'n Br. at 27-33.
[207] *Id.* at 27-28; *see* MSJ Op. at 19 ("the basis for [any] apportionment must be included in the text of the indemnification provision.").
[208] *Id.* at 29-30. Claude asserts proffering C/V as non-infringing alternatives "did not make a license necessary to resolve the [Patent] [L]itigation." *Id.* at 30-31.
[209] *Id.* at 31-33.
[210] *Id.* at 32.

Court has already rejected Claude's proffered temporal limitation on Section 8.2(a).[211]  Hence, the mere fact VOI developed and sold C/V after the Transaction closed does not mean they fall outside Claude's indemnification obligation.  Rather, the Court must determine whether the C/V release qualifies as "Damages suffered . . . as a result of, or in connection with, the Patent Litigation."[212]

The evidence shows the C/V release constitutes Damages suffered in connection with the Patent Litigation.  Although DePuy did not accuse C/V of infringement, VOI injected C/V into the Patent Litigation both to facilitate settlement[213] and as non-infringing alternatives to mitigate damages.[214]  Patrick approved these actions as Sellers' Representative.[215]  Flesher credibly testified Patrick directed the post-Patent Litigation verdict C/V shipments under VOI's annual ordering program.[216]  These actions led DePuy to seek a TRO in the Patent Litigation to prohibit C/V sales.[217]  This evidence shows VOI, at Patrick's direction,

---

[211] *See Supra* V.A.

[212] MIPA § 8.2(a).

[213] PX194; *see* JX40 (email from May to Patrick, forwarded to Claude, noting DePuy was not interested in settling despite the C/V redesign).

[214] *See* PX103; PX197; DX386.

[215] PX103; PX194; PX197; DX386.

[216] 2/13/25 Tr. 66:2-12, 67:9-68:7.  The Court Flesher to be one of the most credible witnesses at trial. *See In re 2004 Harley Davidson VIN No. 1VF9FV31A84R116374*, 2011 WL 601440, at *3 (Del. Super. Feb. 2, 2011) ("[d]uring a bench trial the judge is the sole person responsible for . . . determine[ing] the credibility of every witness.").

[217] *See* DX493 (moving for a TRO); DX508 (opposing DePuy's TRO request, but noting the challenged shipments concerned C/V).  Both DePuy and Defendants stylize these post-verdict sales as VOI flooding the market with infringing products. *See* DX493; Claude Br. At 34-36.  Yet, as discussed, credible trial testimony evidenced these sales were part of VOI's annual ordering program. 2/13/25 Tr. 66:2-12, 67:9-68:7.

made C/V a part of the Patent Litigation.  Thus, settling the Patent Litigation without addressing VOI's prior C/V sales was not realistic.  Accordingly, the portion of the Settlement attributable to the C/V release constitutes Damages related to the Patent Litigation and is indemnifiable.

A different result is warranted concerning the forward-looking C/V license.[218] The C/V license is not "Damages suffered by [VOI]."[219]  The MIPA's definition of Damages does not include a "license" or any analogous term.[220]  "[A]mounts paid in settlement" do not include a forward-looking license.[221]  The word "injunctions" in the definition of "Action" does not support Plaintiffs' position.  "[I]njunctions" expands the types of proceedings giving rise to indemnifiable Damages, *not* the class of injuries subject to indemnification.[222]  Nor does the reference to injunctions in a

---

[218] The Settlement is expressly titled "Settlement and License Agreement."  JX62.  Flesher, the person who negotiated with DePuy, admitted the Settlement includes "a license to VOI and Fidelio to continue to sell [C/V]." 2/13/25 Tr. 205:1-4.

[219] MIPA § 8.2(a).

[220] MIPA § 1 ("Damages").

[221] "[A]mounts paid in settlement" are properly understood as payments to "release[] a party from a potential liability otherwise imposed by law."  *Ketler v. PFPA, LLC*, 132 A.3d 748 (Del. 2016).  Multiple courts, including this one, have noted the different between a license and a release – a license is forward-looking while a release is generally retrospective.  *See Universal Oil Products Co. v. Vickers Petroleum Co. of Delaware*, 19 A.2d 727, 729 (Del. Super. 1941); *Lostutter v. Kentucky*, 2023 WL 4636868, at *4 (6th Cir. July 20, 2023) (differentiating "pardons" which "are retrospective in the sense that they look backward and excuse–indeed, nullify the consequences of–past misconduct," and a "license" which "is usually perspective in that it looks forward and grants permission to engage in some future conduct."); *Cellport Systems, Inc. v. Harman International Industries Inc.*, 2024 WL 1337338, at *7 (E.D. Tex. Mar. 28, 2024) (noting the "general rule" that releases do not "embrace a forward-looking discharge of liability.").

[222] The MIPA requires Claude to indemnify "Damages suffered . . . in connection with, the Patent Litigation[.]" MIPA § 8.2(a).  Thus, Damages are *what* is indemnified.  The phrase "the Patent Litigation" describes from *where* the indemnifiable damages must arise.

35

defined term show Defendants "specifically assumed the liability[y]" for a forward-looking license, as is required to award indemnification.[223]  Accordingly, Claude proved by a preponderance of the evidence the C/V license is not indemnifiable.  The portion of the Settlement attributable to the C/V license must be carved out of Plaintiffs' recoverable damages.

2.  Claude Must Indemnify Damages Attributable to Fidelio.

Claude argues the portion of the Settlement attributable to Fidelio's conduct is not indemnifiable.[224]  Claude contends Damages attributable to Fidelio fall outside Section 8.2(a), because they were not "suffered by [VOI]."[225]

To the extent the Settlement includes Damages attributable to Fidelio, Plaintiffs maintain those amounts are subject to indemnification.[226]  Plaintiffs argue Claude's contrary position "nullifies the phrase 'any and all Damages arising out of or relating to'" in Section 8.2(a).[227]  Plaintiffs point to the term "Affiliates" as confirming any damages caused by Fidelio are subject to indemnification.[228]

---

[223] *See Alcoa World Alumina LLC v. Glencore Ltd.*, 2016 WL 521193, *7-8 (Del. Super. Feb. 8, 2016).

[224] Claude Br. at 37-39. Claude notes DePuy "argued and presented evidence regarding Fidelio's control over VOI and its infringing misconduct, making it Fidelio's conduct." *Id.* at 37 (citing Tr. 3, 88:19-22; DX486.0017; DX189; DX201).  The Patent Litigation jury also found Fidelio liable for willful infringement. *See* JX51; JX62.

[225] Movora Opp'n Br. at 17, 20-22 (quoting MIPA § 8.2(a)).

[226] Movora Opp'n Br. at 3-8.

[227] *Id.* at 3-4 (quoting MIPA § 8.2(a)).

[228] Movora Br. at 38.  Plaintiffs cite Klein's testimony as "confirming that the language . . . contemplates Affiliates' own Patent Litigation Damages." *Id.* at 5 (citing 2/11/25 Tr. 10:12-11:19, 71:17-72:17).

Plaintiffs note Fidelio was jointly-and-severally liable for the Patent Litigation verdict and Settlement – therefore, "[t]hose Damages not only relate to VOI's damages; they are the exact same damages."[229]

Claude advances two main arguments in opposition.[230] First, the term "Affiliates" does not control, because the "language explains who [Defendants] must indemnify, not the conduct or damage for which [Defendants] must indemnify them[.]"[231] Second, Plaintiffs' decision to have VOI pay the entire Settlement does not mean all Damages were suffered by VOI.[232]

The Court agrees with Claude's reading of the word "Affiliates" in Section 8.2(a). Section 8.2 provides Claude "shall . . . indemnify, defend and hold harmless the Buyer, [and] its Affiliates . . . [from] any Damages suffered by [VOI]."[233] The plain meaning of these unambiguous terms shows the word "Affiliates" expands who Claude must indemnify, not what losses are subject to indemnification.[234] Only Damages "suffered by [VOI]" are indemnifiable.[235] Hence, Section 8.2(a)'s

---

[229] Movora Opp'n Br. at 6 (citing 2/13/25 Tr. 44:7-17; 6 *Del. C.* § 2701; Settlement).
[230] Claude Opp'n Br. at 33-37.
[231] Claude Br. at 38 (citing 2/10/25 Tr. 156:17-157:2; 2/11/25 Tr. 63:19-22). Claude contrasts Section 8.2(a)'s terms with the LOI's "broader indemnification language." *Id.* at 38-39; *see* PX54.
[232] Claude Opp'n Br. at 34-35 ("a large portion of the liability remains damages suffered by Fidelio, regardless of how [Plaintiffs] decided to pay the Settlement.").
[233] MIPA § 8.2(a).
[234] *See Scion Breckenridge*, 68 A.3d at 683.
[235] MIPA § 8.2(a).

"Affiliates" language does not compel finding for Plaintiffs' on this issue. That conclusion, however, does not end the inquiry.

The Court concludes any portion of the Settlement attributable to Fidelio is "Damages suffered by [VOI]."[236] The Patent Litigation jury verdict established "joint[] and several[] liabil[ity]" between VOI and Fidelio.[237] Similarly, Fidelio and VOI were jointly and severally liable for the Settlement.[238] A party "subject to joint and several liability *is responsible for the entire obligation* if the other liable person does not pay."[239] Accordingly, VOI was independently liable for the entire Settlement. Hence, the whole Settlement was "suffered by [VOI]."[240] For this reason, there is no portion of the Settlement solely attributable to Fidelio for the Court to carve-out.

3. Public Policy does Not Compel Excluding Parts of the Settlement Due to Alleged Willful Misconduct.

Claude contends "Damages attributable to [Plaintiff]s' willful misconduct" are not indemnifiable as a matter of public policy.[241] Claude points out the Patent

---

[236] *Id.*
[237] 2/13/25 Tr. 44:7-13; *see* JX51.
[238] JX62 § 3.01 ("VOI/Fidelio shall pay or cause to be paid to DePuy Seventy Million Dollars[.]"). *See also* 6 *Del. C.* § 2701 ("[a]n obligation or written contract of several persons shall be joint and several, unless otherwise expressed."); JX62 § 11.02 ("[the Settlement] shall be governed by and construed in accordance with the . . . laws of the State of Delaware[.]").
[239] *Marsh v. State*, 210 A.3d 705 (Table) (Del. 2019) (emphasis added) (citations omitted).
[240] MIPA § 8.2(a).
[241] Claude Br. at 39-43 (citing *Valley Forge Ins. Co. v. Jefferson*, 628 F. Supp. 502, 508 n.3 (D. Del. 1986) ("[u]nder Delaware law, a contract to relieve a party from liability for its intentional or willful acts is unenforceable as against public policy."); *James v. Getty Oil Co.*, 472 A.2d 33, 38 (Del. Super. 1983); *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 592 (Del. Ch. 2023).

Litigation jury found Fidelio willfully infringed, which increased liability and exacerbated the Settlement.[242]  Claude questions Plaintiffs' reliance on Patrick's post-Transaction conduct – when he was Plaintiffs' chosen terminable at-will CEO.[243]

As a matter of law, Plaintiffs argue there is no "public policy basis to exclude supposed willful misconduct."[244]  As a matter of fact, Plaintiffs assert Claude has not proven "Fidelio's or VOI's post-closing conduct exacerbated damages."[245]  Plaintiffs contend DePuy only targeted Fidelio because it acquired VOI, and there is "no evidence [] Fidelio was involved in any misconduct by VOI[.]"[246]

---

[242] JX51. Claude argues Fidelio "used its control over VOI to willfully infringe DePuy's patents and ramp up liability in the Patent Litigation," with the goal of "capturing as much market share as possible[.]" Claude Br. at 40-41 (citing DX491.0155; DX78; DX590.0006-07; DX575.0064-65; DX582.0016; DX508.0181; DX611.0006).

[243] *Id.* at 41-43 ("Patrick's authority to lead VOI and any post-closing actions that created liability stemmed from his appointment as, and were taking in his capacity as, CEO, not Sellers' Representative." (citing 2/14/25 Tr. 64:23-67:4)).  Patrick had no role in VOI after he resigned in December 2022. *See* 2/13/25 Tr. 156:3-12, 234:7-10.

[244] Movora Opp'n Br. at 13-17; *see Salamone v. Gorman*, 106 A.3d 354, 370 (Del. 2014) ("a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract.").  Plaintiffs insist "*James* [*v. Getty Oil Co.*] is an outlier . . . the public policy against indemnification for willful act 'has not gained traction in the Delaware court since *James* was decided.'" Movora Opp'n Br. at 14-15 (quoting *CNX Res. Corp. v. CONSOL Energy Inc.*, 2024 WL 4929171, at *6 (Del. Super. Nov. 8, 2024)).  Plaintiffs argue the other cases Claude cites are differentiable, because they dealt with waivers of liability for fraud or bad faith not indemnification. *Id.* at 16 ("a policy against waiver of a claim is altogether different from one against indemnification. A claim waiver leaves a wronged plaintiff without any remedy; indemnification merely determines who pays the remedy.").

[245] *Id.* at 30-40.

[246] *Id.* at 30-32 ("DePuy's evidence focused heavily on Sellers' conduct, and particularly Patrick's.").  Plaintiffs assert Claude relies on "inadmissible" and unreliable documents to argue otherwise. *Id.* at 32-34 (arguing DX44, DX189, DX201, DX468, DX486, DX491, DX493, DX498, DX502, DX503, DX575, DX582, DX583, DX590, DX610, DX611, DX712, DX788, DX797, JX08, JX50, JX51, and JX62 are inadmissible hearsay).  Per Plaintiffs, the only admissible

39

Portions of the Settlement attributable to Fidelio's alleged post-Transaction willful misconduct are not excludable pursuant to public policy.[247] "'Delaware is a contractarian state that holds parties' freedom of contract in high regard.'"[248] As such, Delaware courts "enforce the plain meaning of clear and unambiguous [contractual] language."[249] Therefore:

> when parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract.[250]

The Supreme Court of Delaware cautions against "void[ing] [an] otherwise [] [] valid [indemnity] contract as contrary to public policy in the absence of clear indicia that such a policy actual exists."[251]

---

evidence Claude musters are documents and testimony related to: (1) VOI's Annual Ordering Program; and (2) the Settlement's statement that Fidelio "willfully infringed" DePuy's patents. *See* DX582; DX590; JX62. Plaintiffs insist neither shows any supposed willful conduct exacerbated damages. *See* Movora Opp'n Br. at 36-38 (citing 4/13/25 Tr. 62:20-68:1, 170:9-20, 212:3-214:9 (testifying that the Annual Ordering Program shipments were a normal occurrence and on advice of counsel, VOI did not believe the shipments were prohibited).

[247] Because the Court concludes Claude's public policy argument is legally deficient, it need not analyze whether Claude proved VOI and Fidelio committed post-Transaction will misconduct that exacerbated the Settlement.

[248] *Village Practice Management Company, LLC v. West*, 2025 WL 1679818, at *15 (Del. June 16, 2025) (quoting *Thompson Street Capital Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, 2025 WL 1213667, at *8 (Del. 2025 April 28, 2025)).

[249] *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).

[250] *Salamone*, 106 A.3d at 370.

[251] *Whalen v. On-Deck, Inc.*, 514 A.2d 1072, 1074 (Del. 1986). Courts have gone so far as to hold "in Delaware, losses are uninsurable as-against public policy only if the legislature so provides. As the Supreme Court [of Delaware] has cautioned, public policy is the General Assembly's domain, and judges should avoid the temptation to legislate from the bench." *Sycamore Partners Management, L.P. v. Endurance American Insurance Company*, 2021 WL 761639, at *11 (Del. Super. Feb. 26, 2021) (citing *Jones v. State Farm Mut. Auto. Ins. Co.,* 610 A.2d 1352, 1354 (Del.

Claude primarily relies on *James v. Getty Oil* to support his public policy argument.[252] The *James* court held a contractual provision "purport[ing] to provide indemnification for injuries or death [] [] caused by or arise out of a 'willful act' of [indemnitee]" was "void and unenforceable."[253] Citing only a contract treatise, the court stated "[a] contract to relieve a party from its intentional or willful acts is. . . unenforceable as being against clear public policy."[254]

---

1992); *Whalen*, 514 A.2d at 1074).  Under this standard, Defendants' public policy argument – which does not invoke any statute or legislative material – fails at the outset.

[252] *See* Claude Br. at 39-43 (citing *James*, 472 A.2d at 38); Claude Opp'n Br. at 37-41 (same).  As Plaintiffs point out, the other authorities Claude cites are differentiable and do not control the Court's analysis.  The United States District Court for the District of Delaware's non-binding statements in *Valley Forge Ins. Co. v. Jefferson* were clarified by the Supreme Court of Delaware in *Whalen*.  *See Whalen*, 514 A.2d at 1073-74 ("the District Court's prediction in *Valley Forge* of how this Court would rule are not controlling.").  Both *New Enter. Assocs.* and *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC* dealt with whether a provision waiving claims for intentional misconduct are void under Delaware public policy.  *See New Enter. Assocs.*, 295 A.3d at 591-93 ("[t]o the extent the Covenant seeks to prevent the Funds from asserting a claim for an intentional breach of fiduciary duty, then the Covenant is invalid . . . because of policy limitations on contracting."); *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *11 (Del. Super. Jan. 13, 2021).  Multiple courts have recognized contractual waiver and indemnification provisions are distinct and implicate different concerns. *See Hummel v. Minnesota Department of Agriculture*, 430 F.Supp.3d 581, 589 (D. Minn. 2020) (holding a contractual provision "appears to be an *indemnification* provision, not a *waiver* provision." (emphasis in original)); *Leonard v. Golden Touch Transportation of New York Incorporated*, 144 F.Supp.3d 640 (D. N.J. 2015) ("an indemnification clause does not provide a basis for dismissal of a claim. . . . An indemnification clause does not shield a party from being called into court, and it does not relieve a party of any duty of care it owes to plaintiffs."); *R & R Capital, LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, at *3  (Del. Ch. Aug. 19, 2008) (granting a motion to dismiss based on a contractual waiver); *Wisconsin Public Service Corp. v. Arby Const., Inc.*, 342 Wis.2d 544, 565 (2012) ("indemnification is not an affirmative defense."); *Velocity Exp., Inc. v. Office Depot, Inc.*, 2009 WL 406807 (Del. Super. Feb. 4, 2009) ("[w]aiver is an affirmative defense[.]"). The *USAA Casualty Insurance Company v. Carr* case denied coverage based on the at-issue policy language, not public policy. 225 A.3d 357, 360-62 (Del. 2020).

[253] *James*, 472 A.2d at 38.

[254] *Id.* (citing 15 WILLISTON ON CONTRACTS § 1750A (3d ed. 1957)).  *See also Steam TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 350 n.156 (Del. 2022) (endorsing the idea that treatises are only persuasive authority, because "[i]t is a fundamental principle of state sovereignty that the

The Superior Court of Delaware recently recognized *James*' articulation of public policy "has not gained traction in the Delaware courts since [the case] was decided."[255]  Post-*James*, Delaware courts have rejected similar public policy arguments, and permitted indemnification of: (1) "punitive damages for wanton conduct;"[256] "losses occasioned by fraud;"[257] (3) "restitution or disgorgement;"[258] and (4) a monetary settlement of a claim alleging indemnitee committed intentional ERISA violations.[259]  The public policy articulated in *James* would seem to, but did not, prohibit such indemnification.  Accordingly, the Court lacks clear indica the public policy stated in *James* exists or outweighs Delaware's reverential freedom of contract principle.[260]  Therefore, the Court concludes public policy provides no basis to limit Claude's indemnification obligation regarding the Settlement.

---

common law decisions of some jurisdictions are merely persuasive authority in the aw of another jurisdiction until that State's courts adopt it.").

[255] *CNX*, 2024 WL 4929171, at *6 ("[a]side from a brief statement in *James*, which has not gained wide acceptance, there is no Delaware law supporting the broad rule" that a contract providing indemnification for a party's own willful misconduct is always void).  The Court is not convinced by Defendants' attempt to differentiate *CNX* on the basis that it involved "backward-looking indemnification." 5/13/25 Tr. 248:3-249:9.  While true the agreement at-issue in *CNX* allocated indemnification obligations for events that had already occurred, the court discussed Delaware public policy generally.  *See CNX*, 2024 WL 4929171, at *1-2, 6 (discussing *James* generally).

[256] *Whalen*, 514 A.2d at 1073-74 ("[t]he Superior Court found that the public policy of Delaware prohibits the issuance of insurance covering punitive damages.  In this Court's view, however, there is no evidence of public policy in this State against such insurance.").

[257] *RSUI Indemnity Company v. Murdock*, 248 A.3d 887, 901-05 (Del. 2021) (rejecting an argument that fraud should not be indemnifiable because, "as a matter of public policy, insurance should not be available for intentional wrongdoing[.]" (internal quotations omitted)).

[258] *Sycamore Partners*, 2021 WL 761639, at *11-12.

[259] *CNX*, 2024 WL 4929171, at *3, 6.

[260] *See Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 676-77 (Del. 2024).

4. <u>Damages Tied to the '728 Patent and NXT Plate are Indemnifiable.</u>

Claude contends any part of the Settlement attributable to the '728 Patent or NXT plates fall outside Section 8.2(a).[261] Specifically, Claude focuses on the fact that the '728 Patent did not exist when the Transaction closed.[262] As such, "at the time of the MIPA, neither party reasonably expected indemnity over any claims on the '728 Patent, let alone on NXT, which was not part of the litigation at closing."[263]

Plaintiffs contend the portions of the Settlement attributable to the '728 Patent and NXT plates are indemnifiable because those amounts arose out of and relate to the Patent Litigation.[264] Plaintiffs assert the trial evidence shows Defendants knew before the Transaction that DePuy was likely to accuse NXT plates.[265] Plaintiffs also note DePuy added NXT plates to the Patent Litigation "by virtue of a continuation patent," the '728 Patent.[266]

Claude primarily argues Damages attributable to the NXT plates and '728 Patent fall outside Section 8.2(a) because the MIPA only indemnifies the reasonable

---

[261] Claude Br. at 43-44.

[262] *See* DX566; DX201.1260; 2/12/25 Tr. 64:21-65:6.

[263] Claude Br. at 43. *See also* DX201 (DePuy bringing claims based on the '728 Patent for the first time in the Patent Litigation).

[264] Movora Opp'n Br. at 22-23.

[265] *Id.* (citing PX67; PX68; PX65; PX71; PX84; 2/10/25 Tr. 154:3-7, 227:10-14).

[266] *Id.* at 23-25 ("DePuy learned about the NXT plates during discovery, used discovery to ascertain how [Defendants] were attempting to design around the '921 Patent, and filed a continuation patent application expanding the claims to block VOI's attempted circumvention." (citing DX192)).

continuation of Defendants' pre-Transaction conduct. The Court already rejected this temporal limitation on Section 8.2(a).[267]

Even if the Court considered Claude's temporal argument, it provides no basis to reduce Plaintiffs' recoverable indemnity. Both the NXT plates and '728 Patent related to the pre-Transaction Patent Litigation. The '728 Patent is a continuation of the '921 Patent that formed the basis of DePuy's claims from the outset of the Patent Litigation.[268] Continuation patents "share the same specification[s]."[269] Accordingly, "the written descriptions of [continuation] patents are, with some modifications, substantially the same [as the original patent]."[270] Therefore, while true "the '728 Patent did not exist . . . at the time of the MIPA,"[271] it is a reasonable continuation of the pre-Transaction Patent Litigation.[272]

Similarly, the evidence shows NXT plates relate to VOI's pre-Transaction conduct. VOI developed the NXT plates in 2019.[273] DePuy sought discovery

---

[267] *See supra* V.A.
[268] *See* 2/12/25 Tr. 19:9-20:18; PX100.0010 (DePuy's Third Amended Complaint alleging, "[t]he '728 patent is a continuation of the '921 patent and shares a common specification), .0073 ('728 Patent stating it is "a continuation of . . . Pat. No. 8,523,921."); JX08 (DePuy's initial complaint asserting claims under the '921 Patent).
[269] *Smartflash LLC v. Apple Inc.*, 680 Fed. Appx. 977, 978 n.1 (Fed. Cir. 2017).
[270] *ACTV, Inc. Walt Disney Co.*, 346 F.3d 1082, 1084 (Fed. Cir. 2003).
[271] Claude Br. at 41-44.
[272] *See* Claude Opp'n Br. at 32 (arguing Section 8.2(a) only provides indemnification "for DePuy's claims relating to conduct and occurrences through the sale of VOI, when [Defendants] controlled the business, *and the reasonable and expected continuation of that conduct*." (emphasis added)).
[273] PX179; 2/11/25 Tr. 183:23-184:2; Patrick Dep. Tr. 106:1-22.

concerning NXT soon thereafter.[274]  Fox Rothschild informed Patrick of DePuy's "intent [] to add the NXT plates to the [Patent Litigation]."[275]  Based on this information, Defendants told Plaintiffs there "was at least a high risk of [NXT plates] being added" to the Patent Litigation.[276]  This unrebutted evidence shows DePuy's allegations concerning NXT plates were anticipated pre-Transaction and relate to conduct when Defendants owned VOI.  Accordingly, Claude owes indemnification on the NXT plates and the '728 Patent.

## D. Plaintiffs Can Recover Patent Litigation Costs and Loan Interest, but Not Attorneys' Fees for this Action.

In addition to the Settlement, Plaintiffs argue the MIPA requires Claude to pay: (1) fees and expenses incurred in the Patent Litigation; (2) interest on the loan used to pay the Settlement; and (3) costs and fees for this action.[277]  Claude maintains none of these alleged damages are recoverable under the MIPA.[278]  The Court evaluates each claimed amount in turn.

### 1. Plaintiffs Can Recover Fees and Expenses Related to the Patent Litigation.

---

[274] PX67 (DePuy Motion to Compel concerning NXT); PX68 (email informing Claude and Patrick of DePuy's request for discovery on NXT plates with the motion to compel attached).  Later emails show Defendants produced discovery concerning NXT before the transaction. *See* PX71 ("[o]ther tasks needed to be performed . . . Production of NXT plates[.]").

[275] PX65; *see* 2/11/25 Tr. 184:3-8; PX84 (email from Fox Rothchild to Patrick stating, "we fully expect [DePuy] to allege your new plates [NXT] also infringe although they have not done so yet.  They have certainly suggested they will be doing so.").

[276] 2/10/25 Tr. 154:3-8, 227:7-14.

[277] *See* Movora Br. at 30-31, 34-35, 37.

[278] *See* Claude Opp'n Br. at 50 n.15; Claude Br. at 49-54.

Plaintiffs argue they are entitled to $8,608,888.99 in Patent Litigation fees and expenses.[279]  Plaintiffs note Section 8.2(a) indemnifies "any Damages suffered by [VOI] as a result of, or in connection with, the Patent Litigation," and "Damages" include "fees and disbursement of counsel[.]"[280]

Claude concedes Plaintiffs can recover costs and fees for the Patent Litigation, but argues the amount requested includes non-recoverable items.[281]  Claude challenges three categories of allegedly non-recoverable Patent Litigation costs.[282] First, Claude asserts Plaintiffs request "fees for work performed for VOI and Fidelio," which are not damages suffered by VOI.[283]  Second, Claude contends Plaintiffs seek "amounts for Fidelio-specific work," which were also not suffered by

---

[279] Movora Br. at 30, 34-35, 37 (citing PX174); *see* 2/13/25 Tr. 262:1-4.

[280] MIPA §§ 1.1 ("Damages"), 8.2(a).

[281] Claude Br. at 51-53.  To the extent Claude identifies one or two minor non-recoverable entries, Plaintiffs insists that does not abrogate his general obligation to indemnify Patent Litigation expenses. Movora Opp'n Br. at 6 n.3 (citing *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *23 (Del. Ch. Jan. 29, 2010) ("absolute precision is not required" to prove the "quantum of damages.")).

[282] Claude Br. at 51-53.

[283] Claude Br. at 51-52 (citing 2/13/25 Tr. 259:18-260:8, 265:2-267:20; PX170).  Plaintiffs point out Finnegan jointly invoiced work done for VOI and Fidelio at Patrick's request.  Movora Opp'n Br. at 7-8.

VOI.[284] Finally, Claude insists Plaintiffs cannot recover cost associated with the non-recoverable Settlement components.[285]

The Court first addresses the recoverability of defense costs attributable to both VOI and Fidelio. Claude asserts, without any supporting authority, that "half of the[] joint VOI/Fidelio fees w[ere] incurred by Fidelio" and are thus not indemnifiable.[286] Plaintiffs argue, also without any support, that such fees "are joint-and-several liabilities."[287] Delaware courts have not squarely addressed whether jointly incurred defense costs attributable to multiple co-defendants are a joint-and-several liability.

---

[284] Claude provides two examples: (1) a 9/22/2021 entry dealing with Fidelio's strategy in answering DePuy's third amended complaint; and (2) a 12/1/2021 entry regarding editing and sending Fidelio's reply to DePuy's opposition to Fidelio's motion to dismiss. Claude Br. at 52 (citing PTX170.0318 (9/22/2021 entry); PX170.0358 (12/1/2021 entry)). Plaintiffs briefly assert both VOI's and Fidelio's Patent Litigation attorneys' fees are indemnifiable "because they are joint-and-several liabilities." Movora Opp'n Br. at 6 n.3. *See also id.* at 8 ("Fidelio's attorneys' fees and expenses 'relat[e] to' 'Damages suffered by [VOI] as a result of, or in connection with, the Patent Litigation' because they are expenses incurred to defend Fidelio against its joint-and-several liability with VOI in the Patent Litigation." (quoting MIPA § 8.2(a) (edits in original))). Yet, "as an accommodation," Plaintiffs already excluded Fidelio-only fees from its request. *Id.* at 6-7 (citing 2/13/25 Tr. 259:1-11). Vimian's general counsel testified as part of these efforts, he "took [] out" entries that "w[ere] predominantly for Fidelio," adopting "a conversative approach and tr[ying] to be fair." 2/13/25 Tr. 260:4-10. Plaintiffs insist Claude did not rebut that testimony or submit an alternative calculation. Movora Opp'n Br. at 6 n.3.

[285] Claude Br. at 52-53.

[286] *Id.* at 52.

[287] Movora Opp'n Br. at 6 n.3. This argument mirror's Plaintiffs' position concerning whether portions of the Settlement attributable to Fidelio are indemnifiable pursuant to the MIPA. *See supra* V.C.2. Yet, while the Settlement plainly established joint-and-several liability, *see supra* n.239, "co-indemnitees who retain[] joint counsel [are] responsible for their pro rata share of . . . litigation costs." *Levy v. Hli Operating Co., Inc.*, 2007 WL 2801383, at *11 n.62 (Del. Ch. May 16, 2007). As such, Plaintiffs' argument that VOI and Fidelio's Patent Litigation attorneys' fees "are the very same fees," is unavailing. Movora Opp'n Br. at 6 n.3.

Under different factual circumstances, the Delaware Court of Chancery "held purported co-indemnitees who retained joint counsel [are] responsible for their pro rata share of advanced fees and litigation costs."[288] In *Valeant Pharm. Int'l v. Jerney*, the Delaware Court of Chancery held two co-defendants were each responsible "for half of all fees and litigation costs," even though one party "was the focus of attention throughout th[e] litigation."[289] The court rejected a request for "a supplemental proceeding to allocate fees and expenses" as unduly burdensome, because "there is no doubt their defense was, by and large, jointly conducted."[290] The court held evenly dividing attorneys' fees was consistent with "the general principle [] that joint obligations give rise to equal contribution."[291]

The Court finds *Valeant Pharm.*'s reasoning persuasive and adopts it here. The trial evidence shows VOI and Fidelio jointly defended the Patent Litigation.[292] Parsing Finnegan's invoices to assign each entry to VOI or Fidelio is unduly burdensome, and ignores "lawyers' time that might appear to be devoted solely to one or the other . . . is just as readily seen as constituting an element of their joint

---

[288] *Levy*, 924 A.2d at 227 n.62 (citing *Valeant Pharm. Int'l v. Jerney,* 921 A.2d 732, 754-55 (Del. Ch. 2007)).

[289] *Valeant Pharm.,* 921 A.2d at 755.

[290] *Id.*

[291] *Id.* (citing *Estate of Keil,* 145 A.2d 563, 565 (Del. 1958)).

[292] *See* PX91; PX92; PX93; PX95.

defense."[293] Therefore, the Court holds Plaintiffs are entitled to half of the Patent Litigation costs and fees incurred in VOI and Fidelio's joint defense.

The Court is not convinced by Claude's other arguments. Claude asserts Plaintiffs' request Patent Litigation attorneys' fees solely attributable to Fidelio. Yet, Claude only identify two minor entries which could reasonably be considered part of VOI and Fidelio's joint defense.[294] More fundamentally, Claude did not rebut Ehn's testimony that Plaintiffs' request excludes defense costs solely tied to Fidelio.[295] Delaware courts do not "require certainty in the award of damages" when a claimant establishes a right to recovery.[296] Accordingly, the inclusion of one or two items which *may* be attributable to Fidelio alone does not invalidate Plaintiffs' contractual entitlement to Patent Litigation costs and fees.

Claude also argues the Court must exclude attorneys' fees incurred in connection with the non-recoverable portions of the Settlement. As discussed above, the only non-recoverable component of the Settlement is the forward-looking

---

[293] *Valeant Pharm.,* 921 A.2d at 755.

[294] Specifically, the 9/22/2021 entry dealing with Fidelio's strategy in answering DePuy's third amended complaint could be attributable, in part, to VOI, because the purpose of a joint defense is to "form[] a common defense strategy." *In re XL specialty Ins. Co.*, 373 S.W.3d 46, 51 (Tex. 2012); *see Federal Election Com'n v. Christian Coalition*, 178 F.R.D. 61, 72-73 (E.D. Va. 1998). Depending on the specific, and unknown, underlying facts, the 12/1/2021 entry regarding editing and sending Fidelio's reply to DePuy's opposition to Fidelio's motion to dismiss could similarly be considered part of formulating an overreaching and consistent defense strategy.

[295] 2/13/25 Tr. 259:1-260:10. "Ehn" refers to Carl-John Ehn, Vimian's general counsel as of August 2022. *See id.* 219:6-21.

[296] *Del. Express Shuttle, Inc. v. Older,* 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002); *see Great Am.*, 2010 WL 338219, at *23.

C/V license.[297]  Claude does not identify what portions of Plaintiffs' requested Patent Litigation fees are attributable to the C/V license.  As such, Claude's third argument does not alter Plaintiffs' recoverable Patent Litigation costs and fees.

### 2.  Plaintiffs Can Recover Interest on the Loan Used to Pay the Settlement.

Plaintiffs seek $9,084,348 in interest incurred through December 31, 2024 on the loan used to pay the Settlement.[298]  Plaintiffs assert such interest is recoverable under Section 8.2(a) as both a "loss" and "interest" "suffered by [VOI] as a result of, [and] in connection with, the Patent Litigation."[299]  Plaintiffs point out VOI, not Fidelio, took the loan and paid the interest.[300]

Claude argues Plaintiffs did not disclose their requested interest damages in discovery, barring any such recovery.[301]  Even if Plaintiffs can recover some loan interest, Claude maintains "Plaintiffs failed to provide a calculation [accounting] for the non-recoverable components of the $70 million [S]ettlement."[302]

---

[297] *See supra* V.C.
[298] Movora Br. at 31 (citing PX175; 2/13/25 Tr. 250:12-252:10, 254:10-257:14).
[299] MIPA § 8.2(a); *see* Movora Br. at 34.
[300] Morova Br. at 37 (citing PX175; 2/13/25 Tr. 256:1-257:8).  Claude asserts it is immaterial that VOI paid the loan, because Plaintiffs *decided* how to pay the Settlement. Claude Opp'n Br. at 34.
[301] Claude Br. at 49-51 (citing 2/10/25 Tr. 217:16-220:6; DX788.0020-22). Claude argues Plaintiffs' non-disclosure prejudiced Defendants who were unable to conduct discovery on: "(1) whether Plaintiffs could have secured a lower interest rate . . . and (2) whether Plaintiffs could have paid down at least some of the principal loan amount[.]" *Id.* at 50.  Plaintiffs note, "Claude does not dispute [] the MIPA provides indemnification for loan interest[.]" Movora Opp'n Br. at 49.  Plaintiffs argue Claude's position is really an untimely discovery dispute which the Court should ignore. *Id.* at 50.
[302] Claude Br. at 51.

The parties' briefing clarifies Claude does not dispute the MIPA entitles Plaintiffs to interest on the loan used to pay the Settlement. Nor could they. Section 8.2(a) requires Claude to indemnify "all Damages suffered by [VOI] as a result of . . . the Patent Litigation."[303] The MIPA defines "Damages" to include "amounts paid in settlement . . . together with interest with respect to [] [] [] the foregoing."[304] Hence, the MIPA provides indemnification for interest accrued on amounts paid to settle the Patent Litigation.

Rather than attack this clear language, Claude argues Plaintiffs' failure to disclose their request for loan interest precludes any recovery. Claude's argument fails. Plaintiffs disclosed their request for loan interest in response to Defendants' first set of interrogatories.[305] At summary judgment, Plaintiffs listed their "indemnification damages" including "VOI's ongoing financing costs for th[e] [S]ettlement[.]"[306] Claude's expert Kinrich recognized Plaintiffs' request – acknowledging VOI took an interest-bearing loan to pay the Settlement.[307] Thus, the Court holds Plaintiffs adequately disclosed their request for interest on the loan

---

[303] MIPA § 8.2(a).
[304] MIPA § 1.1 ("Damages").
[305] DX788.0020-21 ("complete damages, including interest, continue to accrue . . . [damages] continue to increase on a daily basis as a result of interest incurred.").
[306] D.I. 214 at 20 (requesting "the ultimate total Settlement Interest[.]"). *See also* D.I. 219 ¶ 6 (Ehn declaring in support of Plaintiffs' Motion for Summary Judgment, "[t]o be able to make that payment [the Settlement], VOI borrowed $70 million, and has been paying interest on the loan."); D.I. 218, Ex. 84 (agreement memorializing VOI's loan to pay the Settlement, attached as an exhibit to Plaintiffs' Motion for Summary Judgment).
[307] D.I. 256, Ex. 1 at 14 n.44; Ex. 4 at 14 n.44.

used to pay the Settlement. Hence, Claude's first argument provides no basis for abrogating the MIPA's grant of Settlement interest to Plaintiffs.

Separate from the disclosure issue, Claude argues any awarded interest must account for, and carve out, the non-recoverable portions of the Settlement. The only non-recoverable component of the Settlement is the C/V license.[308] Accordingly, Plaintiffs' recoverable loan interest must be reduced to account for the portion of the Settlement tied to the C/V license.[309]

3. <u>The MIPA does Not Grant Plaintiffs Their Costs and Fees in This Action.</u>

Plaintiffs assert the MIPA grants them "enforcement expenses."[310] Claude argues Plaintiffs cannot recover attorneys' fees for this litigation, because the MIPA lacks specific "fee-shifting language in the [] indemnification provision."[311] Rather, Claude maintains Plaintiffs improperly base their attorneys' fees request on "a provision regarding a 'cap' on the indemnification obligation."[312] Plaintiffs acknowledge Delaware law requires a "clear and unequivocal articulation of intent

---

[308] *See supra* V.C.
[309] *See infra* V.E.2.
[310] Movora Br. at 30-31, 35 (citing MIPA § 8.3(a) ("the Cap shall not apply to . . . the expenses of the Indemnified Party in enforcing its rights under this Article 8[.]")).
[311] Claude Br. at 53-54 (citing *Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. for Heyman*, 2020 WL 6582958, at *6 (Del. Super. Nov. 10, 2020)).
[312] *See* MIPA § 8.3(a); Claude Br. at 53-54 (citing *TradSched Sys. v. Versyss Transit Sols., LLC*, 2012 WL 1415466, at *2 (Del. Super. May. 29, 2012)).

to cover attorneys' fees."[313]  Yet, Plaintiffs insist the "Damages" definition – which includes "fees and disbursement of counsel"[314] – is sufficient.[315]

Under well-settled Delaware law, "litigants are [] responsible for paying their own litigation costs . . . 'in the absence of statutory authority or contractual undertaking to the contrary.'"[316]  Absent "specific language" evidencing a "clear and unequivocal" intent to shift fees, a party is not entitled to attorneys' fees for its enforcement of an indemnity right.[317]

The MIPA lacks a clear statement evidencing the parties intended to shift responsibility for attorneys' fees.  Plaintiffs argue the "fees and disbursements of counsel" language in the MIPA's Damages definition permits recovery of attorneys' fees.[318]  Yet, a contractual definition alone does not create a substantive right or obligation.[319]  No provision of the MIPA establishes an affirmative right to attorneys'

---

[313] Movora Opp'n Br. at 47-48 (internal quotes omitted).

[314] MIPA § 1.1 ("Damages").

[315] Movora Opp'n Br. at 48-49.  Accordingly, Plaintiffs clarify they are not relying on Section 8.3(a) as the source of Claude's obligation to indemnify enforcement expenses, but as confirmation that the MIPA contemplates fee shifting. *Id.* (noting "Claude provides not theory for what else this language could mean).

[316] *DeMatteis v. RiseDelaware Inc.*, 315 A.3d 499, 516 (Del. 2024) (quoting *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164 (Del. 1989)).  The Court notes the narrow exception for instances of "bad faith" litigation, does not apply here as neither party advances a bad faith argument. *See Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).

[317] *Ashland*, 2020 WL 6582958, at *6 (internal quotes omitted).

[318] MIPA § 1.1 ("Damages").

[319] *See AB Stable*, 2020 WL 7024929, at *54 n.200 ("[i]n a contract, a defined term simply serves as a convenient substitute for the definition[.]" (internal quotations omitted)); *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *48 n.525 (Del. Ch. Oct. 1, 2018) (same) (internal quotations omitted).  The MIPA's text confirms this conclusion.  The Damages definition does not

fees in enforcement actions.[320]  As discussed above, Section 8.2(a) contemplates indemnification of attorneys' fees incurred "as a result of, or in connection with, the Patent Litigation."[321]  Conversely, the Contingent Closing Notes executed with the MIPA as part of the Transaction explicitly authorizes recovery of enforcement action attorneys' fees.[322]  This evidences the parties knew how to memorialize such a right, but chose not to do so in the MIPA.[323]  For these reasons, the Court holds Plaintiffs cannot recover their attorneys' fees for this action.

impose any obligation on any party, it simply articulates what the parties' agreed would constitute "Damages." *See* MIPA § 1.1 ("Damages").

[320] The Court disagrees with Plaintiffs' position that Section 8.3(a)'s reference to "expenses of the Indemnified Party in enforcing its rights under [] Article 8," shows attorneys' fees incurred in this action are recoverable.  MIPA § 8.3(a).  First, merely mentioning enforcement expenses is not a clear and unequivocal statement evidencing an intent to permit recovery of attorneys' fees.  Second, Section 8.3 references attorneys' fees in the context of discussing what costs do count towards the recoverable indemnity "Cap."  *See* MIPA § 8.3(a).  Plaintiffs argue this evidences an implicit right to attorneys' fees.  Movora Opp'n Br. at 48-49.  Delaware courts hesitate to "imply[] contractual obligations in a contract, when such an obligation is not clearly supported by the terms of the contract."  *Riverside Fund V, L.P. v. Shyamsundar*, 2015 WL 5004906, at *3 (Del. Super. Aug. 17, 2015) (citing *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 881, 897-99 (Del. 2015)).  This hesitancy is well-founded when considering whether a contract overrides the general rule that each party is responsible for their own litigation costs.  As such, the Court does not read Section 8.3(a) as confirming Plaintiffs can recovery their attorneys' fees.

[321] *See supra* V.D.1.  While it could be argued this suit – to recover indemnification from the Patent Litigation – occurred "as a result of" the Patent Litigation, the Court finds the causal connection too attenuated.  The more natural reading of the MIPA is that Plaintiffs are entitled to their attorneys' fees in the Patent Litigation, but not this case.

[322] Contingent Closing Note § 5(g) ("[i]f the Seller commences a proceeding to enforce and collect upon this Note and prevails in such proceeding, the Buyer shall pay all reasonable costs incurred by the Seller in connection therewith, including attorneys' fees and disbursements.").

[323] *See Torrent Pharma, Inc. v. Priority Healthcare Distribution, Inc.*, 2022 WL 3272421, at *9 (Del. Super. Aug. 11, 2022) ("[w]here one contract section omits a terms present in another, the omission is presumed intentional." (citing *McDonald's Corp. v. Easterbrook*, 2021 WL 351967, at *5 (Del. Ch. Feb. 2, 2021)); *Ashall Homes Ltd. v. ROK Entertainment Group Inc.*, 992 A.2d 1239, 1250 & n.56 (Del. Ch. 2010) ("related contemporaneous documents should be read together," "writings executed at the same time and relating to the same transaction are construed together as

**E. Claude is Not Entitled to Any Damages Offset, but Plaintiffs Cannot Recover the $9.8 Million Portion of the Settlement Associated with the C/V License.**

Based on the above findings, the Court must resolve two outstanding issues regarding Plaintiffs' recoverable damages. First, the Court must address Claude's argument that Plaintiffs' damages should be reduced by amounts Plaintiffs received in settlement and VOI's post-Transaction profits.[324] Second, the Court must resolve the value of Plaintiffs' recoverable damages given the forward-looking C/V license is not indemnifiable.

1. Claude is Not Entitled to Offset Amounts Plaintiffs Received from the Settling Defendants or VOI's Post-Transaction Profts.

Claude argues "the Court should deduct from any damages calculations": (1) $31.5 million Plaintiffs received from the Settling Defendants; and (2) VOI's $16.1 million in post-Transaction profits.[325] Claude maintains not carving-out these amounts would give Plaintiffs a "windfall."[326] Accounting for these deductions, Claude asserts he is entitled to his $10.1 million share of the Contingent Closing Note.[327]

---

a single contract[.]" (internal quotations omitted)); *Chicago Bridge*, 166 A.3d at 927 n.61 (endorsing the rule that all writings that are part of the same transaction should be read together).
[324] Claude Br. at 47-49.
[325] *Id.* (citing *Genecor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000); *Hill v. LW Buyer, LLC*, 2019 WL 3492165, at *10 (Del. Ch. July 31, 2019)).
[326] *Id.*
[327] *Id.* at 49.

Regarding the Selling Defendants' payments, Plaintiffs assert Claude relies on the "one-recovery rule" which only applies to joint-and-several, not several-only, liability.[328] Plaintiffs maintain carving out post-closing profits would grant Claude a windfall, because Plaintiffs paid $100 million for VOI "as if the Patent Litigation did not exist."[329] The Court agrees with Plaintiffs on both points.

The MIPA does not require reducing Plaintiffs' damages by amounts received from the Settling Defendants. While breach of contract damages generally "should not act as a windfall" for the claimant,[330] Delaware courts routinely enforce "[c]ontractual provisions that define the type of damages for which a party might be liable" if "they are consistent with principles of contract law."[331] Where sophisticated parties "have expressed their expectations through a specific contractual remedy, Delaware law favors enforcing that remedy."[332]

---

[328] Movora Opp'n Br. at 41-42 (citing *Krieser v. Hobbs*, 166 F.3d 736, 742-44 (5th Cir. 1999). *See also* MIPA § 8.2(a) (providing Defendants owe indemnity "severally . . . but not jointly.").

[329] *Id.* at 42.

[330] *Paul v. Deloitte & Louche, LLP,* 974 A.2d 140, 146 (Del. 2009) (internal quotes omitted).

[331] *Crispo v. Musk*, 304 A.3d 567, 582-83 (Del. Ch. 2023); *see Tropical Nursing, Inc. v. Arbors at New Castle Subacute and Rehabilitation Center*, 2005 WL 8135148, at *4-5 (Del. Super. Apr. 4, 2005); *Concord Plaza Associates, Inc. v. Honeywell, Inc.*, 1987 WL 8884, *1 (Del. Super. Mar. 20, 1987).

[332] *L-5 Healthcare Partners, LLC v. Alphatec Holdings, Inc.*, 2024 WL 3888696, at *7 (Del. Ch. Aug. 21, 2024) (quoting *In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046, at *72 (Del. Ch. Sept. 28, 2021)).

Here, Section 8.2(a) expressly provides Defendants "shall severally (in proportion to their Percentage Interests)[333] but not jointly indemnify[.]"[334] Delaware courts have not interpreted the meaning of a several, but not joint, liability scheme. Section 52.1 of Corbin on Contracts provides, "[i]f two or more parties promise the same performance, their obligation is 'joint.' If they promise separate performances, their obligations may be called 'several.'"[335]  This distinction comports with the Supreme Court of Delaware's interpretation of "joint *and* several liability" – namely, each defendant "is responsible for the *entire* obligation[.]"[336]  Conversely, under a several, but not joint, arrangement "each [party] . . . [is] individually liable for the performance they promised, even if another [party] promised the exact same performance."[337]  Because a severally liable party cannot be forced to perform a co-defendant's obligation, it follows they also cannot benefit from a co-defendant's settlement.[338]  Accordingly, Claude is not entitled to offset amounts Plaintiffs

---

[333] The MIPA sets forth each Seller's Percentage Interest. *See* MIPA, Ex. 7.  Relevant here, Dr. Gendreau's Percentage Interest is 46.296296% and the Trust's is 9.259259%.  *Id.*  As such, Claude's combined Parentage Interest is 55.55%

[334] MIPA § 8.2(a).

[335] CORBIN ON CONTRACTS § 52.1 (2023 ed.). *See also* 12 WILLISTON ON CONTRACTS § 36:1 (stating "several" liability means "each party is bound separately for the performance which [that party] promises and is not bound jointly with anyone else.").

[336] *Marsh*, 210 A.3d 705 (Table) (emphasis added).

[337] *International Marine, LLC v. Delta Towing LLC*, 2013 WL 5890551, at *5 (E.D. La. Nov. 1, 2013) (interpreting the meaning of a contract provision requiring indemnification "severally and not jointly.").

[338] *See Kriesser v. Hobbs*, 166 F.3d 736, 743 (5th Cir. 1999) ("[s]et-offs for settlement and the 'one-satisfaction' rule exist to prevent the plaintiff from recovering twice from the same assessment of liability. But, where liability is not joint-and-several, and each defendant instead bears liability for damages *only proportionate* to his own fault, there *is no* assessment of liability

previously received in settlement from his indemnification obligation.[339]  Similarly, VOI's post-Transaction profits are not a windfall, because Fidelio purchased the right to reap those profits.[340]

2. Plaintiffs Cannot Recover $9.8 Million of the Settlement, which is Attributable to the C/V License.

As discussed above, Section 8.2(a) does not entitle Plaintiffs to indemnification for the portion of the Settlement attributable to the C/V license.[341] The Court must determine how much of the $70 million Settlement to exclude from Plaintiffs' recoverable damages.  As Claude noted throughout this case, Plaintiffs offered no evidence concerning how to split the Settlement into constituent parts – instead consistently arguing the entire Settlement is indemnifiable.[342]  Claude relies on Kinrich's testimony to argue the C/V license is worth approximately $14.6

_____

for damages common to the settling and non-settling defendants. Accordingly, the settlement has an entirely separate basis from the apportioned damages, and the one-recovery rule does not apply.").
[339] Claude also cannot be held liable for a share of the Settlement greater than his proportion of the Percentage Interest. *See* MIPA § 8.2(a).
[340] S*ee* Fitzgerald Dep. Tr. 209:15-210:2; 2/10/25 Tr. 69:3-70:2.
[341] *See supra* V.C.1.
[342] *See* Claude Br. at 44 ("Plaintiffs, at trial, only supported a request for the full $70 million settlement and license payment. They failed to provide a damages calculation that accounted for the non-covered amounts[.]"); *see generally* Movora Br. (critiquing Claude's appraisal of the allegedly non-recoverable components but not advancing an alternate valuation); Movora Opp'n Br. (same).  *See also* MSJ Op. at 18-20 (discussing the parties' apportionment positions).

million scaled or $24.3 million unscaled.[343]  Plaintiffs, however, insist Kinrich's

opinions are unreliable and should be excluded or ignored.[344]

Plaintiffs argue Kinrich's testimony and opinions are "inadmissible, or at the

very least unpersuasive."[345]  Plaintiffs note Kinrich conceded certain issues raised at

trial "would require changing his model and obtaining new data [] caus[ing] every

one of his apportionment calculations to change."[346]  Plaintiffs challenge Kinrich's

testimony on three grounds.[347]  First, Plaintiffs assert Kinrich's apportionment model

allocates the Settlement into five components,[348] but does not account for "at least

five additional components" of value.[349]  Second, Plaintiffs maintain "every one of

[Kinrich's] apportionment figures is wrong," because he relied on an incomplete

---

[343] Claude Br. at 45, 49 n.8 (citing 2/14/25 Tr. 104:14-109:3; DX802); *See* Claude Opp'n Br. at 53-55 (citing 2/14/25 Tr. 108:6-17).

[344] The Court took under advisement Plaintiffs' Motion *in Limine* to exclude Kinrich's opinions. 1/30/2025 Tr. 42:6-12.

[345] Movora Opp'n Br. at 17, 20-22, 39.

[346] *Id.* at 50 (citing 2/14/25 Tr. 141:2-142:19, 161:12-162:4).

[347] *Id.* at 51-57.

[348] *Id.* at 51 (citing 2/14/25 Tr. 89:7-21, 140:10-14).

[349] *Id.* at 51-52.  Specifically, Plaintiffs contend Kinrich failed to account for "(1) DePuy releasing its fee-shifting claim; (2) DePuy releasing its prejudgment interest claim; (3) DePuy releasing its post-judgment interest claim; (4) VOI's avoidance of additional litigation fees/expenses; and (5) VOI's avoidance of the costs of an enormous appeal bond." *Id.* at 51-52; *see* 2/14/25 Tr. 194:23-195:21.  Plaintiffs assert Kinrich testified adding additional components would require chancing his model and re-running his calculations.  *See* 2/14/25 Tr. 123:11-20, 140:15-141:17.

dataset to calculate the "reversal rate."[350] Third, Plaintiffs argue Kinrich's $24 million nominal valuation of the C/V license "is irrelevant" and "unreliable."[351]

Claude argues the Court should deny Plaintiffs' request to exclude Kinrich's opinions and testimony – advancing three arguments.[352] First, Claude asserts "there is no testimony that the additional components identified by Plaintiffs would actually impact Kinrich's analysis."[353] Second, Claude argues Kinrich's failure to include all relevant cases in his reversal rate data set "would [] only 'trivial[ly]' impact[] his calculations."[354] Finally, Claude contends Kinrich's calculation of the C/V license's unscaled value "is conservative" and reliable.[355]

---

[350] Movora Br. at 52-55 (citing *Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1270 (Del. 2013) (holding where "the foundational data underlying opinion testimony are unreliable . . . . any opinion drawn from that data is likewise unreliable.") (internal quotes omitted)). Plaintiffs argue Kinrich's 21-case dataset, prepared by Claude's counsel, did not account for at least five additional cases where an appeals court "affirmed a jury trial willful infringement verdict." *Id.* at 52-54; *see* 2/14/25 Tr. 158:20-167:3 (discussing PX230, PX231, PX234, PX235, and PX237). Plaintiffs insist Kinrich admitted these cases should have been included and "would lower the reversal rate," therefore changing "all the damage calculations in [his] report[.]" 2/14/25 Tr. 158:20-168:1.

[351] Movora Br. at 55-57 (citing Tr. 5, 185:11-18). *See also* 2/14/25 Tr. 107:11-108:10 (Kinrich) (discussing how Kinrich calculated the license's nominal value). To support that position, Plaintiffs rely on the testimony of its rebuttal expert Dr. Choi. *See* Movora Br. at 55-57 (citing 2/14/25 Tr. 201:18-204:20).

[352] Claude Opp'n Br. at 51-55.

[353] *Id.* at 51. Rather, Kinrich testified those components would either increase the non-recoverable amount or have no effect. *See* 2/14/25 Tr. 143:1-9, 145:146:9.

[354] Claude Opp'n Br. at 52-53 (quoting 2/14/25 Tr. 167:20-169:11). Claude also notes "Kinrich relied upon other reported studies of reveral rates, which corroborated the 15% reversal rate determined by the dataset." *Id.* at 52 (citing 2/14/25 Tr. 95:17-97:18). Claude also rejects Plaintiffs' suggestion that Kinrich's opinions are excludable because he did not personally compile the dataset used to calculate the reversal rate. *Id.* at 51-52.

[355] *Id.* at 53-55. Claude rejects Plaintiffs' position regarding BioCurve, because if "Plaintiffs could have seamlessly switched to BioCurve, they would have identified BioCurve as a non-infringing alternative in the Patent Litigation." *Id.* at 54.

The Court finds Kinrich's opinions unreliable and therefore excludes his testimony. Expert opinions are excludable "[i]f the foundational data underlying [the] opinion testimony are unreliable" or "the expert draws conclusions . . . based on flawed methodology."[356] Here, every one of Kinrich's calculations is affected by the reversal rate – i.e. the chance the Patent Litigation jury verdict would be reversed on appeal.[357] Kinrich calculated a reversal rate based on a dataset of 21 cases.[358] At trial, however, Kinrich was repeatedly confronted with cases absent from his dataset he admitted should have been included.[359] While Kinrich testified adding additional cases is "easy" and changes his calculations "by an almost trivial amount,"[360] he also conceded he did not know how many exigent cases were improperly absent from his dataset.[361] As such, Kinrich effectively admitted he does not know the proper reversal rate, a figure affecting each of his valuation opinions. Accordingly, the Court finds Kinrich's opinions are based on unreliable data. Therefore, the Court does not credit Kinrich's opinions in determining the value of the C/V license.

---

[356] *Council of the Village of Fountainview Condominium v. Corrozi-Fountain View LLC*, 2022 WL 18865191, at *2 (Del. Super. Nov. 21, 2022) (citing *Tumlinson*, 81 A.3d at 1269).
[357] 2/14/25 Tr. 167:20-168:1.
[358] *Id.* 153:23-154:6.
[359] *See id.* 58:20-166:23; PX230; PX231; PX234; PX235; PX237. Kinrich also issued a corrected expert report pre-trial to account for miscoding two cases included in his original dataset. *See* 2/14/25 Tr. 157:14-158:13.
[360] *Id.* 168:1-14. The Court is not convinced any change would be trivial. Using Kinrich's own reversal rate calculation methodology, including only the five excluded cases raised at trial would change the reversal rate by at least 46% (from 15% to 22%) depending on how those flagged cases are coded. *See* D.I. 256 at 38.
[361] 2/14/25 Tr. 167:1-7.

The Court concludes $9.8 million of the Settlement is attributable to the C/V license. During Settlement negotiations DePuy proposed two alternatives: (1) "a [$]60.2 million lump sum payment . . . plus a 20 percent royalty on Versiv, Compresiv, and CBLO"; or (2) a "[$]70 million lump sum payment[.]"[362] This credibly suggests DePuy – a party unaffected by the current indemnification dispute – contemporaneously valued the C/V license at $9.8 million.[363] Delaware courts often rely on prelitigation appraisals by disinterested third-parties when valuing an asset.[364] Accordingly, the Court similarly credits DePuy's valuation of the C/V license and reduces the portion of the Settlement Plaintiffs can recover by $9.8

---

[362] 5/16/25 Tr. 22:18-24:8; *see* PX142.

[363] Plaintiffs acknowledge the $9.8 million is "overinclusive because CBLO is included. 5/16/25 Tr. 24:9-10. Plaintiffs' counsel affirmatively represented at post-trial argument that DePuy assigned a value of "9.8 million for the license" when discussing the portion of the Settlement attributable to the C/V License. *See id.* 22:5-25:11. Accordingly, the Court accepts Plaintiffs' implicit suggestion that the "full 10 million differential [is attributable] to Compresiv/Versiv." *Id.* 25:9-11.

[364] *See Basho Technologies Holdco B, LLC v. Georgetown Basho Investors, LLC*, 2018 WL 3326693, (Del. Ch. July 6, 2018) (crediting "valuations [that] provided *a real-time, non-litigation driven*, before-and-after assessment of the [at-issue asset's] value." (emphasis added)); *Henke v. Trilithic Inc.*, 2005 WL 2899677, at * (Del. Ch. Oct. 28, 2005) ("contemporary pre-merger management projections *are particularly useful in the appraisal context* because management projections, by definition, *are not tainted by post-merger hindsight and are usually created by an impartial body*." (internal quotes omitted) (emphasis added)); *Pinson v. Campbell-Taggart, Inc.*, 1989 WL 17438, at *7 & n.7 (Del. Ch. Feb. 28, 1989), *as revised*, (Nov. 28, 1989) (holding courts are skeptical to credit "corporate fiduciaries[']" valuation of assets "not obtain[ed] [by] an independent appraisal by a disinterested financial advisor[.]"); *Ryan v. Tad's Enterprises, Inc.*, 709 A.2d 675, 681(Del. Ch. 1996) ("[t]he Court consider[s] th[e] contemporaneous valuation more reliable than the defendants' trial expert's valuation, *which was conducted six years later and for purposes of litigation*." (emphasis added)).

million.  Additionally, Plaintiffs' recoverable Settlement loan interest is reduced by $1,271,808.72 to account for the portion attributable to the C/V license.[365]

## VI.   CONCLUSION

The Court finds as follows:

1. Plaintiffs proved Claude breached the MIPA by failing to provide indemnification for the Settlement.

2. Claude did not prove any countervailing breach of the MIPA by Plaintiffs that abrogates his indemnification obligation.

3. The entire Settlement, except for the C/V License, falls within the MIPA's indemnification provision.

4. Plaintiff is entitled to its Patent Litigation attorneys' fees and interest on the loan used to pay the Settlement, but not attorneys' fees for this action.

For the foregoing reasons, the Court enters judgment for Plaintiffs and awards $40,172,084.49[366] in damages.  If there are any open issues not addressed or mooted by this post-trial opinion, the Parties shall notify the Court by letter within five days. Otherwise, the Parties shall prepare a form of order entering judgment in accordance with this Opinion. IT IS SO ORDERED.

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**

---

[365] *See supra* V.D.2.

[366] This number corresponds to Claude's 55.55% share of the $72,316,983.78 total liability.  The total liability figure equals the $70 million Settlement, reduced by $9.8 million, plus the $9,084,348 in loan interest – reduced by $1,271,808.72 to account for interest accruing from the excluded portion of the Settlement attributable to the C/V license ($9,084,348 * ($9,800,000 / $70,000,000)) – plus $4,304,444.50, representing half the requested Patent Litigation attorneys' fees.